**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| **WILLIAMS FARMS, LLC** | § | |
| **ROBERT VOLKER,** | § | |
| **and** | § | |
| **CYRUS STEARNS,** *et al*, | § | |
| | § | **CIVIL ACTION NO.: _____** |
| **PLAINTIFFS** | § | |
| | § | |
| **v.** | § | **JURY REQUESTED** |
| | § | |
| **SYNGENTA AG,** | § | |
| **SYNGENTA CROP PROTECTION AG,** | § | |
| **SYNGENTA CORPORATION,** | § | |
| **SYNGENTA  CROP PROTECTION,** | § | |
| **    LLC,** | § | |
| **SYNGENTA BIOTECHNOLOGY, INC.,** | § | |
| **and** | § | |
| **SYNGENTA  SEEDS, INC.,** | § | |
| | § | |
| **DEFENDANTS** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Williams Farms, LLC, Robert Volker, Cyrus Stearns, and all Plaintiffs listed

in Exhibit A, which is incorporated by reference as if fully stated herein (collectively,

"Plaintiffs"), bring this action against Defendants Syngenta AG ("Syngenta AG"), Syngenta

Crop Protection AG ("Crop Protection AG"), Syngenta Corporation ("Syngenta Corp."),

Syngenta Crop Protection, LLC ("Crop Protection, LLC"), Syngenta Biotechnology, Inc.

("Syngenta Biotech") (now merged with Crop Protection, LLC with Crop Protection, LLC as

the survivor), and Syngenta Seeds, Inc. ("Syngenta Seeds") (now known as Syngenta Seeds,

LLC) (collectively, "Defendants" or "Syngenta"), and respectfully state the following:

## NATURE OF THE ACTION

Biotechnology holds promise to potentially improve the lives of many.  But it also can

cause extraordinary harm if handled irresponsibly.

Part of acting responsibly requires biotechnology companies to avoid introducing a new genetic trait into the market prematurely before it has been approved in all significant export markets. All in the industry, including Syngenta, recognize that premature commercialization can cause significant trade disruptions and enormous harm to farmers and other industry participants. As such, they have made a pledge to each other and to other stakeholders, including corn farmers, that they will act responsibly in introducing new bio-engineered genetic traits into the market.

Syngenta had the opportunity to act responsibly in 2010. Its new genetically modified corn Agrisure Viptera®, containing the MIR162 genetic trait, had just been deregulated by the U.S. Department of Agriculture ("USDA"). But Syngenta was aware that a large and growing export market for U.S. corn farmers, China, had not approved MIR162. In fact, Syngenta had only that same year sought regulatory approval in China, and at the time, the average time for regulatory approval in China was 2-3 years. The process is longer if applications are incomplete or incorrect. And Syngenta's were. Syngenta had been previously warned by industry participants not to introduce another MIR genetic trait because of lack of approval in export markets, and the devastating consequences that could occur from such premature commercialization.

But Syngenta also knew that the clock was ticking on the expiration of its patent for this genetic trait. Every year that passed without commercialization meant lost monopoly profits generated by the patent.

Syngenta had a decision to make. It could wait until China approved its new genetic trait and temporarily forego its monopoly profits. That is what it had pledged to do, and what responsible practice in any event dictated. Or, Syngenta could immediately commercialize

Agrisure Viptera®, and create an enormous risk that U.S. corn farmers would lose one of their large and growing export markets.

Sadly, Syngenta opted for its monopoly profits over responsibility to its stakeholders. It chose to commercialize Viptera® for the 2011 crop year knowing that China would not approve MIR162 until sometime *after* that trait had entered export channels.

During 2011 - 2013, Syngenta was called upon again by industry participants to show responsibility and stop its overly aggressive commercialization. China's importance as a purchaser of U.S. corn had continued to grow and it still had not approved MIR162. Syngenta's response was to *expand* sales for the 2012 and 2013 growing seasons, and capture more monopoly profits.

In November 2013, the very occurrence that had been foreseen by industry participants, including Syngenta, occurred. U.S. corn exports to China were found to be contaminated with MIR162, which still had not been approved by China. As a result, China began rejecting U.S. corn shipments.

After the rejection of U.S. corn shipments, industry participants in early 2014 demanded that Syngenta immediately halt commercialization of Agrisure Viptera®. They also demanded that Syngenta not commercialize a brand new product, Agrisure Duracade™, which also contained MIR162 and a new event, not approved by China and other export markets – Event 5307. Industry participants pointed out that they were "gravely concerned about the serious economic harm" to those in the industry, including farmers, caused by the loss of the Chinese market. At that time, the National Grain and Feed Association quantified the economic harm as already ranging from $1 billion to $2.9 billion.

Syngenta, however, doubled down. It continued to sell Agrisure Viptera®, and

launched Agrisure Duracade™ for the 2014 crop year, thereby prolonging the economic harm indefinitely. Those irresponsible actions also ensured that the economic losses to farmers and others in the industry would continue to grow.

Syngenta's wrongful actions are corporate greed at its worst. But there is more. To attempt to minimize the perceived impact of its conduct, Syngenta actively misled farmers, industry participants, and others about the importance of the Chinese market, the timing and substance of its application for approval in China, the timing of when China was likely to approve MIR162, its ability to "channel" Viptera® to non-Chinese markets and otherwise contain the infiltration of Viptera® into the U.S. corn supply and other issues described below. In fact, even though it represented to the USDA and the public that "there should be no effects on the U.S. maize export market" from deregulation, and it would impose stewardship and channeling requirements to steer Viptera® corn away from export markets that had not approved it, Syngenta did not follow through in any meaningful way on this commitment. Just the opposite.

When one company – Bunge North America, Inc. ("Bunge") – tried to minimize the risk that Viptera® would be found in shipments to China by refusing to accept it, Syngenta sued Bunge in an effort to force it to accept Viptera®. Syngenta was far more concerned about the impact on its business than it was about the loss of an important export market for corn farmers.

Under the basic laws of supply and demand, when there is less demand for a product, the price is lower than it otherwise would be. China was a large and growing export market, and was predicted by the USDA to be the largest export market for corn by 2020. The loss of the Chinese market has caused enormous economic harm to U.S. corn farmers, which continues to grow. Although China finally approved MIR162 in December 2014, it has not approved

Event 5307. U.S. corn exports to China have not yet begun to recover, and it remains to be seen whether they will ever regain the levels they would have attained but for the embargo.

By filing this Complaint, U.S. corn farmers seek compensation for losses they have suffered as a result of Syngenta's irresponsible conduct, and punitive damages for Syngenta's reprehensible and outrageous behavior.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this case under 28 U.S.C. § 1331 and 15 U.S.C. § 1121(a) because Plaintiffs assert claims under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

2.      This Court also has jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and this action is between citizens of different states and/or citizens or subjects of a foreign state. This Court also has jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).

3.      The Judicial Panel on Multidistrict Litigation ("MDL Panel") has consolidated numerous similar actions alleging the same claims against the same Defendants for coordinated pretrial proceedings in MDL No. 2591; *In re: Syngenta AG MIR162 Corn Litigation* (D. Kan.). Plaintiffs anticipate the MDL Panel also will transfer this action to MDL No. 2591. The Hon. John Lungstrum of the District of Kansas, therefore, will have jurisdiction over this action as the designated transferee court.

4.      At all relevant times, Defendants marketed, sold, or otherwise disseminated Agrisure Viptera® and Agrisure Duracade™ corn seed in this District and in each District in which Plaintiffs reside and conduct their farming operations (*see* Exhibit A). Without waiving the right for their claims to be transferred to their home Districts for trial, under 28 U.S.C. § 1407, Plaintiffs assert that venue also is proper in the District of Kansas for coordinated pre-trial proceedings in

MDL No. 2591, under 28 U.S.C. §§ 1391 and 1407. Plaintiffs respectfully reserve their right to determine the appropriate venues for the trials of their claims pursuant to Judge Lungstrum's March 10, 2015 Order Relating To Consolidated Pleadings (MDL No. 2591, Dkt. #287 ) at ¶¶ 2(a) and (c).

## PARTIES

### PLAINTIFFS

**5.** Plaintiff Williams Farms, LLC is a Texas limited liability company with its principal place of business in Carson County, Texas. At all relevant times, Williams Farms, LLC was engaged in the business of planting, growing, harvesting, gathering, distributing, and selling corn. Williams Farms, LLC has been (and continues to be) damaged by Syngenta's wrongful actions described herein; *inter alia*, its premature release of Agrisure Viptera and Agrisure Duracade corn seed into the U.S. market before the MIR 162 traits were approved by the Chinese government, which destroyed the China export market for U.S. corn and depressed its price, and its corresponding misrepresentations to U.S. corn farmers.

**6.** Plaintiff Robert Volker ("Volker") is a resident of Dallas County, Texas. At all relevant times, Volker was engaged in the business of planting, growing, harvesting, gathering, distributing, and selling corn. Volker has been (and continues to be) damaged by Syngenta's wrongful actions described herein; *inter alia*, its premature release of Agrisure Viptera and Agrisure Duracade corn seed into the U.S. market before the MIR 162 traits were approved by the Chinese government, which destroyed the China export market for U.S. corn and depressed its price, and its corresponding misrepresentations to U.S. corn farmers.

**7.** Plaintiff Cyrus Stearns ("Stearns") is a resident of Williamson County, Texas. At all relevant times, Stearns was engaged in the business of planting, growing, harvesting, gathering, distributing, and selling corn. Stearns has been (and continues to be) damaged by

Syngenta's wrongful actions described herein; *inter alia*, its premature release of Agrisure Viptera and Agrisure Duracade corn seed into the U.S. market before the MIR 162 traits were approved by the Chinese government, which destroyed the China export market for U.S. corn and depressed its price, and its corresponding misrepresentations to U.S. corn farmers.

8.    Plaintiffs listed in Exhibit A, all of whom are incorporated by reference as if fully stated herein, reside or maintain their principal places of business in the noted towns in Alabama, Arkansas, California, Colorado, Georgia, Iowa, Idaho, Illinois, Indiana, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, New York, Ohio, Oklahoma, South Dakota, Tennessee, Texas, Virginia, Washington, and Wisconsin. At all relevant times, Plaintiffs listed in Exhibit A were engaged in the business of planting, growing, harvesting, gathering, distributing, and selling corn. Plaintiffs listed in Exhibit A have been (and continue to be) damaged by Syngenta's wrongful actions described herein; *inter alia*, its premature release of Agrisure Viptera and Agrisure Duracade corn seed into the U.S. market before the MIR 162 traits were approved by the Chinese government, which destroyed the China export market for U.S. corn and depressed its price, and its corresponding misrepresentations to U.S. corn farmers.

**DEFENDANTS**

9.    Defendant Syngenta AG is a Swiss corporation with its principal place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland. Syngenta AG is a publicly traded company on the Swiss stock exchange.  American Depositary Receipts for Syngenta AG are traded on the New York Stock Exchange. Syngenta AG was formed in 2000 as a result of the merger of Novartis Agribusiness and Zeneca Agrochemicals, and is the only publicly traded company among the various Syngenta entities named as defendants in this case. Syngenta AG may be served with process under FED. R. CIV. P. 4(h)(2) and 4(f)(1), and in

accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, by forwarding two copies of the Summons and this Complaint to: Appellationsgericht, Basal-Stat, Baumleingasse1, 4051 Basel, Switzerland. Syngenta AG has been served with Summons and appeared in MDL No. 2591.

10.     Defendant Syngenta Crop Protection AG is a Swiss corporation with its principal place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland. Upon information and belief, Syngenta Crop Protection AG is a subsidiary of Syngenta AG. Syngenta Crop Protection AG may be served with process under FED. R. CIV. P. 4(h)(2) and 4(f)(1), and in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, by forwarding two copies of the Summons and this Complaint to: Appellationsgericht, Basal-Stat, Baumleingasse1, 4051 Basel, Switzerland. Syngenta Crop Protection AG has been served with Summons and appeared in MDL No. 2591.

11.     Defendant Syngenta Corporation is a Delaware corporation with its principal place of business at 3411 Silverside Road # 100, Wilmington, Delaware 19810-4812. Syngenta Corporation is a subsidiary of Defendant Syngenta AG. Syngenta Corporation does not have a registered agent in the State of Texas (or the State of Kansas), and may be served with process under FED. R. CIV. P. 4(h)(1)(A) and (B) by mailing, via registered or certified mail, the Summons and this Complaint to: Cheryl Quain (or successor), Corporate Secretary, Syngenta Corporation, 3411 Silverside Road, Suite 100, Shipley Building, Wilmington, Delaware 19810, and/or The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, its registered agent for service of process. Syngenta Corporation has been served with Summons and appeared in MDL No. 2591.

12.     Defendant Syngenta Crop Protection, LLC is a Delaware limited liability company

with its principal place of business at 410 South Swing Road, Greensboro, North Carolina 27409-2012. Syngenta Crop Protection, LLC is a subsidiary of Defendant Syngenta Seeds. Syngenta Crop Protection, LLC may be served with Summons and a copy of this Complaint by serving (i) CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, Texas 75201-3136, or (ii) The Corporation Company, Inc., 112 SW 7th Street, Suite 3C, Topeka, Kansas 66603 (Kansas), its registered agents for service of process in Texas and Kansas, respectively. Syngenta Crop Protection, LLC has been served with Summons and appeared in MDL No. 2591.

13.    Defendant Syngenta Biotechnology, Inc., formerly a Delaware corporation with its principal place of business at 3054 East Cornwallis Road, Research Triangle Park, North Carolina 27709-2257, was recently merged into Defendant Syngenta Crop Protection, LLC with Defendant Syngenta Crop Protection, LLC as the surviving entity. Prior to its merger with Defendant Syngenta Crop Protection, LLC, Syngenta Biotechnology, Inc. was a subsidiary of Defendant Syngenta Seeds, and traced its operations back to CIBA-Geigy Corporation, a Syngenta legacy company. Syngenta Biotechnology, Inc. does not have a registered agent in the State of Texas (or the State of Kansas). Syngenta Biotechnology, Inc. has been served with Summons and appeared in MDL No. 2591.

14.    Defendant Syngenta Seeds, LLC, formerly a Delaware corporation with its principal place of business at 11055 Wayzata Boulevard, Minnetonka, Minnesota 55305-1526, is now a Delaware limited liability company. Syngenta Seeds, LLC is a direct subsidiary of Defendant Syngenta Corporation.  In its Complaint filed in *Syngenta Seeds, Inc. v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB (N.D. Iowa) ("*Bunge*"), Syngenta Seeds, LLC describes itself as:

> [A] leading agribusiness company committed to sustainable agriculture through research and technology. Syngenta is, among other things, in the commercial seed business. It develops, produces, and sells, through dealers and distributors or directly to growers, wide range of agricultural products, including corn and

> soybean seed exhibiting useful traits that have been developed with the techniques of modern biotechnology. The seed products are then grown and harvested as raw materials for the production of biofuels or grain for livestock feed; or are milled and processed for food products.

Among Syngenta Seeds, LLC's products sold in all states in which Plaintiffs have farming operations and produced corn are the Agrisure Viptera® and Agrisure Duracade™ corn seeds. Syngenta Seeds, LLC may be served with Summons and a copy of this Complaint by serving (i) CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, Texas 75201-3136, or (ii) The Corporation Company, Inc., 112 SW 7th Street, Suite 3C, Topeka, Kansas 66603 (Kansas), its registered agents for service of process in Texas and Kansas, respectively. Syngenta Seeds, LLC has been served with Summons and appeared in MDL No. 2591.

15.     Defendant Syngenta AG wholly owns, directly or indirectly, Defendants Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC (including Syngenta Biotechnology, Inc.), and Syngenta Seeds, LLC (formerly known as Syngenta Seeds, Inc.).

16.     Syngenta AG represents itself as a global company. According to the Syngenta website, Syngenta AG's Board of Directors "has full and effective control of the company and holds ultimate responsibility for the company strategy."

17.     One or more members of Defendant Syngenta AG's Board of Directors or the Executive Committee established by the Board of Directors also serve as member(s) of the Board of Directors of Defendants Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC (including Syngenta Biotechnology, Inc.), and Syngenta Seeds, LLC (formerly known as Syngenta Seeds, Inc.). Defendant Syngenta AG's Executive Committee also formulates and coordinates the global strategy for Syngenta businesses, and maintains central corporate policies requiring Syngenta subsidiaries, including those named as Defendants herein, under the general guidance of the Syngenta group control.

18.     Defendants' employees maintain reporting relationships that are not defined by legal and/or corporate relationships but, in fact, cross Defendants' blurred corporate lines. For example, Defendant Syngenta Crop Protection AG has two separate product lines – Seeds and Crop Protection – that cut across Syngenta's interwoven corporate entities.

19.     Defendants also are subject to oversight requiring them to seek approval for certain decisions from higher levels within the functional reporting structure – including, in some instances, Defendant Syngenta AG. Appointments of senior management personnel for Defendants also may require, in certain instances, approval from individuals or governing bodies that are higher than each subsidiary Defendant's respective board of directors.

20.     The management of Defendants Syngenta AG and Syngenta Crop Protection AG were intimately involved in and, in some instances, directed decisions concerning the commercialization of Viptera® without Chinese approval.

21.     Defendant Syngenta AG also maintains a central global finance function governing all Defendants. Defendant Syngenta AG's subsidiaries, therefore, do not function independently, but rather, function under the Defendant Syngenta AG umbrella.

22.     Defendants regularly refer to themselves as "Syngenta," with no further description.

23.     Thus, the respective jurisdictional contacts of Defendants Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC (including Syngenta Biotechnology, Inc.), and Syngenta Seeds, LLC (formerly known as Syngenta Seeds, Inc.) in the forum state(s) are attributable to Defendant Syngenta AG because of the unusually high degree of control Defendant Syngenta AG exercises over these subsidiaries. *See, e.g., City of Greenville v. Syngenta Crop Protection, Inc.*, 830 F.Supp.2d 550 (S.D. Ill. 2011).

24.     On information and belief, Defendants also acted (and continue to act) in concert,

pursuant to agreements or other arrangements, in a collective manner and/or as joint venturers regarding the actions and events giving rise to this Complaint. Defendants, therefore, are jointly and severally liable for the acts about which Plaintiffs complain.

## FACTUAL ALLEGATIONS

### INTRODUCTION

25.    Biotechnology firms, such as Syngenta, develop and obtain patents on their bio-engineered products. A patent gives the biotechnology firm the exclusive right to sell its bioengineered products; however, those patents eventually expire. Biotechnology firms have an economic incentive to "commercialize" (*i.e.* bring their products to market for planting and harvest) as soon as possible after filing a patent application in order to maximize profitability.

26.    According to Grant Ozipko, the goal set by Syngenta senior leadership (including Charles Lee, David Morgan, Steve Ligen and/or Diane Mayhart) was to achieve 9.5% market share for MIR162 by 2014. *See* Grant Ozipko Deposition (10/19/12) (*Bunge*) at 72-73. Syngenta was concerned with "commercialization as soon as possible." *See* MIR162H-I Stage gate progression review (December 16, 2009).

27.    But premature commercialization poses a well-known and significant risk of harm to farmers if bio-engineered commodity products are commercialized before they are approved by major importing nations. Certain importing nations, such as China, have a "zero tolerance" policy and will reject grain imports from the U.S. upon detecting the presence of even trace amounts of an unapproved bio-engineered genetic trait in U.S. grain shipments. This was well known by participants in the biotechnology industry, including Syngenta by at least 2007.

28.    Syngenta commercialized MIR162 – and Event 5307 – despite the clear risk of harm to its stakeholders, including Plaintiffs, Syngenta's knowledge of the risk, and Syngenta's own professed commitment to responsible management.

29.    Syngenta commercialized MIR162 by consistently misrepresenting the importance and status of China's approval without adequate systems in place to isolate or channel MIR162, virtually assuring that MIR162 would contaminate the U.S. corn supply.

30.    As recognized within the industry, and by Syngenta, the harm threatened by irresponsible commercialization is very real.

31.    "There have been a number of high-profile cases involving genetically modified varieties . . . and disruption of international shipments of commodity grains such as corn,  wheat, and rice." *See* http://www.syngentafoundation.org/index.cfm?pageID=703.

32.    For example, bio-engineered corn contaminated the U.S. corn supply in 2000 and disrupted international trade, causing loss to farmers and other industry participants. *In re StarLink Corn Products Liability Litigation*, 212 F. Supp. 2d 828 (N.D. Ill. 2002).

31.    In 2006, bio-engineered rice contaminated the U.S. rice supply, again disrupting trade and causing massive damages to U.S. rice farmers and other industry participants. *See, e.g., In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004 (E.D. Mo. 2009); *Bayer CropScience LP v. Schafer,* 2011 Ark. 518, 385 S.W.3d 822, 832 (Ark. 2011).

32.    In addition to being aware of these and other well-publicized incidents at the time it commercialized MIR162, Syngenta had (and has been) continuously warned by stakeholders about the importance of, and need for, responsible commercialization.

33.    For example, when Syngenta commercialized MIR604 (Agrisure® RW) in 2007, the National Grain and Feed Association ("NGFA") (of which Syngenta is a member) and the North American Export Grain Association ("NAEGA") warned against an "'ill-conceived' plan to commercialize" Syngenta's Agrisure biotechnology-enhanced corn as endangering U.S. corn and corn-product exports since it had not obtained regulatory approval for food and feed use in

Japan and other U.S. export markets. Houin, "Feed and grain organizations warn growers of limited export markets," Farm World (April 25, 2007).

34.     The International Grain Trade Coalition also chastised Syngenta, stating that Syngenta "did not respect the responsibility of importing governments to perform necessary risk assessments as demanded by their legislation," that the introduction of Agrisure® RW "was not done in an open transparent manner," and that Syngenta "did not complete authorization in major international markets possessing scientifically sound approval systems prior to commercialization." Letter from International Grain Trade Coalition to Michael Pragnell, CEO Syngenta (April 18, 2007) at 2. The International Grain Trade Coalition further stated that Syngenta's conduct "[e]xposed downstream members of the value chain including producers, handlers, exporters, importers, food processors and distributors to significant liability as currently all countries employ a zero threshold policy for an event not authorized by the importing country" and strongly urged Syngenta to "reverse immediately its decision to commercialize Agrisure RW at this time." *Id.*

35.     The Biotechnology Industry Organization ("BIO") is the world's largest biotechnology trade association, of which, on information and belief, Syngenta is or was a member. BIO has expressly recognized that "[a]synchronous authorizations combined with importing countries maintaining 'zero tolerance' for recombinant-DNA products not yet authorized results in the potential for major trade disruptions." BIO Product Launch Stewardship Policy (May 21, 2007) at Annex 1 Introduction; *see also* BIO Product Launch Stewardship" (December 10, 2009) at Annex 1 Introduction (same); BIO "Stewardship: Actions to be Taken Prior to Launching Special Traits" (October 4, 2010) at Annex 1 Introduction (same); BIO Product Launch Stewardship: Food and Agriculture Section (November 27, 2012)

at Annex 1 Introduction (same).

36.    As stated in BIO's December 10, 2009 Product Stewardship Policy:

Since the commercial introduction of biotechnology-derived plant products in 1996, an increasing number of biotechnology-derived plant products intended for food or feed use are authorized for commercial production in many countries throughout the world; however, authorizations in importing countries vary depending on the timing of submissions for import authorization as well as the duration of the authorization process in each country. As a consequence of these asynchronous authorizations, low levels of recombinant-DNA plant materials that have completed full safety assessments in accordance with national and international standards in one or more countries may, on occasion, be present in food or feed in countries in which the authorization process of the relevant recombinant-DNA plant material has not been completed. Asynchronous authorizations combined with importing countries maintaining 'zero tolerance' for recombinant-DNA products not yet authorized results in the potential for major trade disruptions.

http://www.bio.org/sites/default/files/Product_Launch_Stewardship_12_10_09.pdf.

### RECOGNIZED STEWARDSHIP OBLIGATION

37.    The risk in premature commercialization is well-recognized within the industry and as a result, biotechnology organizations, including CropLife International (of which Syngenta is a member) and BIO, have developed stewardship standards under which biotechnology firms refrain from commercializing their products before they are approved by importing nations.

38.    The very genesis of BIO's product launch policy in 2007 was Syngenta's launch of MIR604 without Japanese import approval. *See* John Bernens Deposition (Nov. 2, 2012) (*Syngenta Seeds, Inc. v. Bunge North America, Inc*., No. 5:11-cv-04074-MWB (N.D. Iowa Aug. 22, 2011)) at 110-13; February 19, 2008 email from Sarah Hull to Jane Bachmann and Anne Burt ("While I know we will be ready to sell MIR162 in the US in 2009, it seems we won't have the stacks approved in Japan to fully launch the product without managing some of the trade implications. This is where grain traders were so upset with the [Agrisure] RW launch.  We

commercialized without having Japan approval prior to planting.  That in turn spawned the BIO Policy.").

39.    Syngenta has, since at least 2007, represented that it is "committed to the principles of good stewardship, which are exemplified through the responsible management of [its] products across their lifecycle [including] commercialization" and its support for BIO's Product Launch Stewardship policies. *See* BIO Product Launch Policy, Syngenta Implementation Principles (Nov. 2007) (http://www.syngentabiotech.com/biopolicy.aspx). On information and belief, Syngenta's Jeff Cox has expressly indicated Syngenta's support for this policy and pledged that "we will implement it with Syngenta."

40.    Under the BIO stewardship policy, developers like Syngenta should meet applicable regulatory requirements in key markets prior to commercialization. *See* BIO Product Launch Stewardship (December 10, 2009) at 4.

41.    Under the BIO policy, developers also should:

Conduct a market and trade assessment to identify key import markets, including those with functioning regulatory systems, prior to the commercialization of any new biotechnology product (crop by event) in any country of commercial launch. In that market and trade assessment, consult at an early stage with the value chain for the specific crop. *Manage the product's introductions so that choice of production methods (coexistence) and markets (e.g., specialty, identity preservation, and global) for that crop are available and preserved.*

*Id.* (emphasis added).

42.    Under the BIO policy in 2009, key markets included "at minimum," the United States, Canada, and Japan. Id. (emphasis added).

43.    For purposes of the BIO policy, "commercialization" means the first planting of seed for the production of a crop or crop product. See BIO Product Launch Stewardship (December 10, 2009) at 4 n.4. *See also* February 19, 2008 email from Sarah Hull to Jane Bachmann and Anne Burt (commercialization is defined in BIP Policy as the first planting of seed sold into commerce

for the production of a crop).

44.    BIO policies are minimum standards of responsible behavior. BIO expressly states that its policy "does not limit the implementation of additional measures designed to facilitate adoption and use of [commodity crop] products and to prevent disruption of . . . the trading of the commodity." BIO Product Launch Stewardship (December 10, 2009) at 4.

45.    Another biotechnology industry association, Excellence Through Stewardship, advocates similar standards through its "Product Launch Stewardship Guide." http://excellencethroughstewardship.org/wp-content/uploads/Approved-Product-Launch-Stewardship-Guide-Revised-07-22-10.pdf. Syngenta is a "founding member" of this program. www.syngentabiotech.com/biostewardship.aspx.

46.    Biotechnology industry groups are not alone in recognizing the importance of stewardship. For example, the National Grain and Feed Association's Policy on Agriculture Biotechnology provides:

> The NGFA supports agricultural biotechnology and other scientific advancements that promote safe and abundant food and feed supply. However, the NGFA believes *biotech-enhanced traits should be commercialized only after achieving broad, deep consumer acceptance, as well as authorizations from U.S. export markets, to enable the industry to meet customer preferences and maintain access to global markets.* The NGFA advocates prudent policies to guard against the presence of unauthorized or restricted-use biotech-enhanced traits in the general commodity stream.

*See* http://www.ngfa.org/news-policy-center/positions-priorities/ (emphasis added).

47.    The North American Export Grain Association agrees:

> Biotechnology providers should be required to accept liability to compensate parties for economic damage resulting from a failure to adequately implement and enforce binding risk-management (stewardship) and supply chain management plans deemed sufficient and effective in preventing biotech events from becoming present in the general commodity stream at levels that could disrupt efficient commerce.

One of the most important of these commitments is to voluntarily restrict commercialization (marketing of seeds) under corporate stewardship plans until such time as the technology provider has obtained sufficient import authorizations from foreign governments. It is imperative that such import authorizations be in place to provide U.S. grains and oilseeds with competitive, reliable and efficient access to international markets.

The reality is that bulk grain and oilseed shipments 'may contain' a biotech-enhanced event that has been made available to producers for commercial production. Any biotechnology trait present in such shipments that lacks approval in a country of import will confront an impossible-to-achieve zero tolerance in that country. The consequences of such occurrences are dire, including impeding the ability of importing countries to provide for food security, imperiling present and future market opportunities for U.S. farmers, and unrecoverable and extensive product and shipment-rejection costs to the U.S. production and grain marketing system.

These international authorizations need to be in place at the time seed containing the event first is purchased by producers. U.S. corn producers often make their initial seed purchase decisions in the fall prior to spring planting – about the same time as international buyers begin substantial contracting for delivery of the next year's harvest. Given that such contracts are contingent upon receiving authorizations for all biotech-enhanced events that may be present in the commodity shipment, NAEGA and NGFA believe import authorizations need to be in place at least one year prior to harvest- time deliveries from U.S. farms.

However, we recognize that technology providers may find the opportunity for economic reward attractive enough to avoid completing U.S. export market approvals prior to product launch in the United States. In such cases, appropriate restraints and responsibility for risks imposed on downstream stakeholders when and after a crop biotechnology event is in production must be part of all technology providers' product stewardship commitments. Such restraint and risk responsibility is critically important when crop biotechnology is deployed under regulatory systems like the science-based U.S. coordinated regulatory framework, which does not apply an international merchantability or marketability test prior to commercialization of the genetically engineered event. Under no circumstances can or should the grain handling, processing or export  industry sectors in the United States or abroad be expected to shoulder the financial risks associated with market disruptions that they have little, if any, ability to control or manage. Rather, the technology providers that do have the ability to control such exposure – and reap the economic reward of commercialization prior to authorization of their products in international markets – must be held responsible. Doing otherwise creates market risk, and undermines the ability of U.S. agriculture to contribute to global food security, as well as to U.S. economic growth and job creation.

*See* http://naega.org/wp-content/uploads/2012/05/NGFA-NAEGA-Joint-Statement-on-Pioneer-

Petition-for-APHIS-Deregulation-of-Pioneer-Hi-Bred-International-Biotech-Maize-.pdf.

48.     The Syngenta Foundation For Sustainable Agriculture states that "until a country issues a registration approval for cultivation and/or food and/or feed consumption, there is a clear responsibility and liability, even if the government scientific assessments show that there are no safety or environmental concerns," and recognizes that stewardship, among other things, "works to prevent trade disruptions." http://www.syngentafoundation.org/index.cfm?pageID=703.

### SYNGENTA RECOGNIZES ITS STEWARDSHIP OBLIGATION

49.     Under the "Corporate Responsibility" section of its website, Syngenta acknowledges the integrated nature of the commodity market and its responsibility to "stakeholders" affected by its business, including farmers:

> Our stakeholders are the people who can affect our business or who are affected by it. They include the following groups:
>
> Growers
> Industry
> Non-governmental organizations and international agencies
> Investors
> Employees
> Government

50.     Syngenta has committed to "respond to feedback from its stakeholders" and "to implement high standards of stewardship for the safe, effective and environmentally responsible use of its products." *See* http://www.syngenta.com/global/corporate/en/about-syngenta/corporateresponsibility/Pages/cr-policy-and-commitments.aspx.

51.     Syngenta represents that "it prioritize[s] the issues that are most relevant to our business and most important to our stakeholders."

52.     Syngenta also represents that it "maintain[s] the highest standards across our entire business and go[es] beyond regulatory compliance."

53.    In Syngenta's "Code of Conduct," posted on its website for farmers to read,

Syngenta represents:

- "The trust and confidence of Syngenta's stakeholders is critical to our continuing success and will only be sustained if the company acts and is seen to act in accordance with the highest standards of ethics and integrity. To ensure we meet the standards which our stakeholders expect, we have produced this new Syngenta Code of Conduct . . . ."

- "We provide innovative, reliable, high-quality products and *have safeguards to protect stakeholders.*"

- "The creativity of our people provides products which help growers meet the global challenges to agriculture."

- *"We will work closely with customers, contractors, users and all other stakeholders to ensure proper and responsible use of our products and understanding of the precautions that apply . . . ."*

(emphasis added).

54.    In November 2007, Syngenta adopted its own "Bio Product Launch Policy." The

Syngenta Bio Product Launch Policy incorporates BIO's Product Launch Policy, requiring

Syngenta to perform a market and trade assessment to identify key importing nations and obtain

those nations' approval prior to commercializing a new bio-engineered product. *See*

http://www.syngentabiotech.com/biopolicy.aspx.

55.    On its website, Syngenta also suggests that it complies with the stewardship

standards adopted by CropLife International and Excellence Through Stewardship, advising

farmers that they may learn more about "stewardship" by visiting the provided links. *See*

http://www.syngentabiotech.com/BioStewardshipLinks.aspx.

56.    It is clear the importance of obtaining import approval from key markets was well

known and recognized within the biotechnology industry and by Syngenta before Syngenta

commercialized MIR162, under the Agrisure Viptera® brand name and trademark for the 2011 crop year.

57.    And Syngenta had committed to not commercializing new genetically modified traits that had not been approved by key import markets. *See, e.g*., BIO Product Launch Policy, Syngenta Implementation Principles (Nov. 2007). Even if it had not, Syngenta clearly knew the risks of premature commercialization, and knew that without stringent containment and channeling procedures, MIR162 would contaminate the U.S. corn supply and move to export markets—thereby causing significant trade disruption as set out below.

58.    Based on clear warnings and its own knowledge, Syngenta knew or plainly should have known that China was a key and growing market for U.S. corn. Responsible practice dictated that Syngenta not commercialize Agrisure Viptera®, and certainly not do so without adequate containment and effective channeling measures in place prior to obtaining import approval. Syngenta, however, did just the reverse.

### REGULATION, TESTING, AND DEREGULATION OF MIR162

59.    The process of commercialization begins with obtaining approvals from U.S. agencies, including (but not limited to) deregulation from the Animal, Plant and Health Inspection Service ("APHIS") of the USDA.

60.    The regulations in 7 C.F.R. part 340 (the "GMO Regulations") regulate, among other things, the introduction (importation, interstate movement, or release into the environment) of organisms and products altered or produced through genetic engineering that are plant pests or about which there is reason to believe may be plant pests. Such genetically engineered organisms and products are considered "regulated articles." The GMO Regulations were promulgated under the Plant Protection Act (the "PPA"), 7 U.S.C. § 7701, et seq., or its predecessor statutes.

61.     MIR162 is a genetically modified trait which, prior to its deregulation, was regulated by the USDA under the PPA and GMO Regulations.

62.     The GMO Regulations at 7 C.F.R. §§340.3 and 340.4 allow release into the environment of regulated, genetically modified traits, such as MIR162, prior to their deregulation, through field trials conducted under permits issued by, or notifications to, APHIS. Developers who field test genetically modified traits, such as Syngenta Biotech in its field testing of MIR162, are required to adhere to certain performance standards set forth in the GMO Regulations to ensure that the regulated genetically modified organism does not persist in the environment or enter the food or feed supply. Similarly, at the end of all field tests, developers must destroy or properly contain any viable plant material in the field and ensure that no regulated material persists in the environment beyond the duration of the trial.

63.     Syngenta is no stranger to release of regulated GMO events. In 2005, Syngenta entered into a settlement with the USDA ($375,000 fine plus a required training program) stemming from its release of still-regulated Bt10 corn, which Syngenta supplied as deregulated Bt11 corn between 2001 and 2004. About 14,000 bags of Bt10 seeds, or enough to plant 37,000 acres, were sold from 2001 to 2004, mainly to farmers in the U.S., but also in Canada and Argentina. The Bt10 event was found in at least five Bt corn breeding lines in the U.S., and was estimated that the seeds could have been planted on 37,000 acres in the U.S., producing "an estimated 150,000 tons of corn from this area" and accounting for approximately .01% of the total U.S. corn acreage. *See U.S. Fines Swiss Company Over Sale of Altered Seed*, NEW YORK TIMES (April 9, 2005); *Syngenta Agrees to Settlement With USDA on Unintended Bt10 Corn*, PR NEWSWIRE (http://www.prnewswire.com/news-releases/syngenta-agrees-to- settlement-with-usda-on-unintended-bt10-corn-54220787.html). Syngenta later paid a $1.5M fine to the EPA,

which conducted an investigation confirming the distribution of unregistered Bt10 corn on "over 1000 occasions." EPA News Release, *EPA Fines Syngenta $1.5 Million for Distributing Unregistered Genetically Engineered Pesticide* (Dec. 21, 2006).

64.    Between 1999 and 2007, Syngenta Biotech conducted at least 119 field trials of MIR162 corn under at least 20 permits issued by, or notifications to, APHIS under the GMO Regulations at sites in 31 states, including multiple field tests in each of the ten (10) states with the largest corn production, and in most of the states in which Plaintiffs farm.

65.    The GMO Regulations in 7 C.F.R. §340.6(a) provide that any person may submit a petition to APHIS seeking a determination that an article should not be regulated under 7 C.F.R. part 340.

66.    On May 24, 2007, Syngenta filed a patent application for MIR162 to secure its exclusive right to market the corn trait pending regulatory approval by the USDA.

67.    On or about September 10, 2007, Syngenta Biotech submitted a petition (the "MIR162 Deregulation Petition") seeking a determination of nonregulated status (APHIS Petition Number 07-253-01p) for corn (Zea mays L.) designated as transformation event MIR162, which was genetically engineered for insect resistance, stating that corn line MIR162 is unlikely to pose a plant pest risk, and should not be a regulated article under the GMO Regulations.

68.    Upon information and belief, Syngenta Biotech continued its field tests of MIR162 under the GMO Regulations during the approximate 31-month period after filing the MIR162 Deregulation Petition and the USDA decision deregulating MIR162 in April 2010.

69.    Syngenta Biotech stated in the MIR162 Deregulation Petition that it understood "that a copy of the MIR162 Deregulation Petition may be made available to the public as part of

the public comment process." MIR162 Deregulation Petition at 3 of 268. APHIS' notice,
published in the Federal Register on January 13, 2010 (75 Fed. Reg. 1749) (the "MIR162
Deregulation Notice"), expressly invited public comment regarding the MIR162 Deregulation
Petition, and provided instructions as to how copies of the petition and accompanying draft
environmental assessment and plant pest risk assessment could be obtained.

70.    In a preliminary observation to Section IX of the MIR162 Deregulation Petition,
entitled "Adverse Consequences of Introduction" (the "Adverse Consequences Discussion"),
Syngenta Biotech represented that it knew "of no data or observations that indicate [that]
MIR162 would adversely impact the quality of the human environment, directly, indirectly, or
cumulatively. This includes a lack of anticipated effects on . . . the economy, either within or
outside the U.S."

71.    Among the specific matters addressed in the Adverse Consequences Discussion
were "Economic Impacts" at Section IX.D:

> Economic considerations are not explicitly described in the factors listed in 40 CFR
> § 1508.27. However, economic impacts do relate to the significance of the
> requested action and have been considered by some courts in reviewing NEPA
> [National Environmental Policy Act] compliance.

*Id*. at 108-109.

72.    The economic impacts discussed included the "Effects on the Export Market," at
Subsection IX.D.4, which included Syngenta Biotech's representation that "there should be no
effects on the U.S. maize export markets" and advised that applications for approval of MIR162
maize were in process in a number of such export markets with "functioning regulatory
systems," including China, stating:

> There should be no effects on the U.S. maize export market since Syngenta **is
> actively pursuing regulatory approvals** for MIR162 maize in countries with
> functioning regulatory systems for genetically modified organisms and that import

> maize from the U.S. or Canada. Regulatory filings for MIR162 maize are in
> process for Colombia, Japan, South Korea, Taiwan, China, the Philippines,
> Australia and New Zealand, South Africa, the European Union, Russia, and
> Switzerland. (emphasis added).

*Id*. at 111.

73.    Other portions of the MIR162 Deregulation Petition made similar representations

regarding China.

74.    Syngenta Biotech also stated in Subsection IX.D. of the MIR162 Deregulation

Petition that stewardship agreements with growers would require channeling of MIR162 away

from export markets which had not approved import of MIR162 maize, Syngenta would

undertake "a wide-ranging grower education campaign" respecting channeling, and channeling

would be effective based upon prior experiences with the specialty maize market:

> Syngenta's stewardship agreements with growers will include a term requiring
> growers to divert this product away from export markets (i.e. channeling) where
> the grain has not yet received regulatory approval for import. Syngenta will
> communicate these requirements to growers using a wide-ranging grower
> education campaign (e.g., grower Stewardship Guide). As noted in the context of
> the IRM program, these procedures are not hypothetical.
>
> The ability to channel particular types of maize for particular uses, such as the
> export market, is demonstrated by the continuing success of the specialty maize
> market. Use of identity preservation measures has enabled growers to maintain a
> wide variety of specialized maize products, including white food maize, waxy
> maize, hard endosperm maize, high oil maize, nutritionally enhanced maize, high
> extractable starch maize, non GMO maize, and organic maize (U.S. Grains Council,
> 2006). Channeling programs are well established for separating each of these maize
> varieties. As set out above, these practices have continued successfully long after
> the introduction of numerous varieties of transgenic maize.

75.    Upon information and belief, the stewardship agreements to which Syngenta

Biotech referred were between producers and Syngenta Seeds.

76.    In December 2009, based upon its review of the MIR162 Deregulation Petition,

APHIS prepared a Draft Environmental Assessment that parroted Syngenta Biotech's

representations in the MIR162 Deregulation Petition:

> There should be no effects on the U.S. corn export market since Syngenta is actively pursuing regulatory approvals for the MIR162 corn in countries with functioning regulatory systems for genetically modified organisms and that import corn from the U.S. or Canada. Regulatory filings for the MIR162 corn are in process for . . . China.

77.    The Draft Environmental Assessment was among the documents publicly available under the MIR162 Deregulation Notice.

78.    On April 12, 2010, APHIS concluded that MIR162 corn should be deregulated. See Syngenta Biotechnology, Inc. Determination of Nonregulated Status for Corn Genetically Engineered for Insect Resistance, 75 Fed. Reg. 20560 (April 20, 2010).

79.    Prior to making this determination, APHIS, on April 9, 2010, issued its National Environmental Policy Act Decision and Finding of No Significant Impact and, in March 2010, issued its Final Environmental Assessment. APHIS compared anticipated impact by taking no action (i.e., keeping MIR162 as a regulated article) with deregulating MIR162, concluding in the Finding of No Significant Impact that in each instance, the impact upon the "Export Market" would remain "unchanged." Similarly, in the Final Environmental Assessment dated March 2010, APHIS adopted and repeated Syngenta's representations that it did not expect any effects on the United States corn export market "by the cultivation of the MIR162 corn cultivars," and applications to countries with functioning regulatory systems, including China, were in process.

80.    Thereafter, on April 21, 2010, Syngenta issued its press release, Syngenta Receives Approval for Breakthrough Corn Trait Technology in the U.S. (April 21, 2010). In making the announcement that MIR162 had been deregulated, Syngenta noted the plans for its imminent commercialization, stating that "[t]he trait will be combined with the Agrisure 3000GT trait stack to provide corn growers with broad-spectrum, insect control and glyphosate tolerance

for maximum convenience and productivity" that "Syngenta plans to commercialize hybrids containing the Agrisure Viptera® trait for the 2011 growing season." The April 21, 2010 press release confirms that the MIR162 Deregulation Petition was a document prepared and published by Syngenta for the sole purpose of facilitating, promoting and inducing the commercial sale of its products containing MIR162 maize.

81.    The MIR162 Deregulation Petition contained statements and representations to induce APHIS to deregulate MIR162, thereby beginning the commercialization of the product. The MIR162 Deregulation Petition also was filed with full knowledge that the statements and representations therein would be published to stakeholders – including the intended purchasers and distributors of Syngenta's products.

82.    The commercial nature of the statements in the MIR162 Deregulation Petition are clear: In explaining the rationale of the MIR162 Deregulation Petition, Syngenta stated that "[t]ransformation event MIR162 maize has been developed by Syngenta to provide growers with maize varieties that are resistant to feeding damage caused by a number of significant lepidopteran insect pests. This trait will be offered to growers in combination with other deregulated maize traits." Id. at 11 (emphasis added). The MIR162 Deregulation Petition not only espoused the sale of the product to growers, it was rife with statements and representations about the commercial benefits of Syngenta's product and expected market impact thereof. Among other indications that the MIR162 Deregulation Petition was a document in which commercial representations and statements were made are the following statements:

a)    "Transformation event MIR162 has been developed by Syngenta to provide U.S. growers with maize hybrids that are resistant to feeding damage caused by a number of lepidopteran insect pests … Commercialization of this new trait has the potential to reduce conventional insecticide use in maize, increase grower profits, and improve grain quality." (*id.* at 13);

b)    ". . . [I]t [MIR162] will be commercialized as a combined-trait hybrid with Syngenta's

Bt11 maize event." (*id.* at 96);

c)  Syngenta's numerous references to and representations regarding the commercial benefits to farmers from introduction of MIR162 (*see, e.g.*, *id.* at 5, 97, 109 [enhanced productivity] (*id.* at 110) [increased competition and farmer and consumer choice]);

d)  Syngenta's repeated observations that no adverse consequences should occur to the economy, either within or outside the U.S. (*see e.g.*, *id.* at 5) and the statements regarding the lack of impact upon exports and intended channeling away from export markets which had yet to approve MIR162, as alleged above;

e)  An appendix report regarding the economic implications of the introduction of MIR162; and

f)  Syngenta's acknowledgement that the MIR162 Deregulation Petition would be made available to the public as previously alleged (*id.* at 3).

83.    Contrary to Syngenta's representations that its regulatory filings were "in process" in China, Syngenta first sought regulatory approval for MIR162 from China's Ministry of Agriculture three years later in or around March 2010. See http://www.syngenta-us.com/viptera_exports/images/MIR162-Regulatory-Timeline-9-2014.pdf.

84.    Consistent with its statements to the USDA in the Deregulation Petition, Syngenta considered China to have a functioning regulatory system. Charles Lee, Syngenta's Head of Corn for North America, has testified:

> Q: All right. Does China have a functioning regulatory system as you use that term?
> A: Yeah. So I believe BIO is very specific about what a functioning regulatory system is that, you  it protects intellectual property. It operates on a set of defined timelines and we would consider that to be functioning.
> Q: So yes, China has a functioning regulatory system?
> A: Yes.
> Q: And to your understanding they did in 2010 as they do today?
> A: Yes.

Charles Lee Deposition (Sept. 7, 2011) (*Bunge*) at 72-73. *See also* NGFA Newsletter (July 14, 2011) ("China is one of the countries that has a functioning, predictable and science-based regulatory system for approving bio-enhanced events.").

SYNGENTA'S INITIAL COMMERCIALIZATION

**85.**    As Syngenta knows, nothing about USDA deregulation requires a developer like Syngenta to commercialize. See Charles Lee Deposition (Sept. 7, 2011) (Bunge) at 69-72.

**86.**    Responsible practice dictated that Syngenta obtain import approval from key market countries prior to commercialization (at minimum, before first planting). See, e.g., BIO Product Launch Stewardship (December 10, 2009) at 4.

**87.**    As early as 2009, Syngenta referred to China as a "Key" export country. See Viptera Timeline Storyboard Discussion dated March 29, 2009 (listing "Key Export Approvals," including China and stating: "China import approvals???").

**88.**    In discussing countries for which regulatory approval should be obtained prior to commercialization, Syngenta's Miloud Araba identified the "key countries" that would "probably be considered the minimum for corn" to include China. See September 29, 2010 email from Miloud Araba to Kevin Turnbald.

**89.**    In a presentation to the NGFA in 2010, Syngenta listed China as among "key import approvals" it was or would be seeking. See Powerpoint entitled "2010 Syngenta Pipeline," Presentation to the National Grain and Feed Association.

**90.**    Syngenta, however, well knew that it would not have import approval from China for the 2011 crop year.

**91.**    The typical time period for import approval from China during this time period was approximately 2-3 years.

**92.**    Syngenta was not even projecting approval from China for the 2011 crop year, but rather, hoping for approval by the 2012 crop year. A July 20, 2010 Syngenta Powerpoint Presentation contains a chart showing submission and anticipated approval dates by country.

This chart indicates that Syngenta requested import approval from China on March 1, 2010, and anticipated approval by May 10, 2012. See id.

93.     In a deposition in the Syngenta v. Bunge case, Syngenta's North American head of Corn, Charles Lee, revealed that Syngenta privately planned from the outset to commercialize Agrisure Viptera® with or without China's regulatory approval, notwithstanding the commitments it had made to stakeholders and industry participants not to commercialize genetically modified traits until after approval from key export markets.

94.     Syngenta commercialized Agrisure Viptera® for the 2011 growing season despite the lack of regulatory approval from China, and despite Syngenta's knowledge that China was a key (and growing) export market for U.S. corn.

95.     Syngenta did not disclose these facts to growers. See, e.g., August 4, 2011 email from Bryan Young, Burrus Seed Farms, Inc. ("I think this is very poor of Syngenta by getting the trait out there and not telling us it wasn't approved.").

96.     Syngenta was well aware in 2010 of the strong likelihood that China would be a significant import market by 2011. After reviewing a USDA Forecast of China's 2010-2011 Crops and Trade, Syngenta's John Bernens stated in a May 13, 2010 email: "Look at the stocks to use ratio. The fear of China's approvals might be bigger than anyone thought."

97.     It was well known at least by August 2010 that China was an important and growing export market for US corn—as reflected in a trade publication at the time:

> China is entering a 'new era' of corn buying. The world's most populous country may import as much as 15 million tons of corn in 2015, according to the U.S. Grains Council. . . . Chinese imports of corn will grow from 1.7 million tons in 2010 to 5.8 million tons in 2011, and to 15 million tons in 2014-15, according to Hanver Li, Chairman of Shanghai JC, speaking to the U.S. Grains Council . . . Where will China import all this corn from? The first place they will turn is the U.S., which is the world's largest corn exporter, accounting for 60% of global corn exports in 2009 . . . If China imports an incremental 600 million bushels of corn in 2014 from the

U.S., using the USDA's baseline projections, U.S. corn ending stocks would be 960 million bushels. This would put the Ending Stocks to Use Ratio at 6.3%, the lowest level since 1995. 2010 is a major turning point in the grain market. The Chinese transition to becoming a net importer of corn will have a substantial implication on the world's corn supply.

*See* http://www.farmlandforecast.com/2010/08/chinese-imports-to-change-grain-markets/

**98.**    Syngenta was, and continues to be, a member of the U.S. Grains Council, to which Mr. Li made his presentation. Indeed, Syngenta's Rex Martin has, upon information and belief, actively participated as a member of the Council's Biotechnology Advisory Team.

**99.**    In addition, NAEGA warned Syngenta of the importance of obtaining Chinese regulatory approval prior to launch during a meeting in or around August 2010 with NGFA's Biotechnology Committee. See July 14, 2011 NGFA Newsletter. The same issue was discussed at the subsequent NGFA Biotechnology Committee meetings – once during the March 2011 convention and another conducted on June 29, 2011 in Washington.

**100.**    Syngenta knew of NAEGA's warning by the summer of 2010, and also knew of NAEGA's position that import approval should be obtained from China before marketing MIR162. See John Bernens Deposition (Nov. 2, 2012) (Bunge) at 215-21.

**101.**    Bernens made everyone at Syngenta aware of NAEGA's position, but Syngenta refused to stop marketing and sale of Agrisure Viptera® in 2010 for planting and harvest in 2011. Id. at 222-23.

**102.**    In the fall of 2010, NGFA, in a private meeting with David Morgan, Regional Director of North America and President of Syngenta Seeds, also urged Syngenta to delay commercialization of Agrisure Viptera®, emphasizing the risk of trade disruption with China.

**103.**    On October 29, 2010, a Reuters article was circulated among Syngenta executives stating: "Chinese corn imports have rocketed this year and are expected to continue growing next

year, after China's own harvest couldn't keep up with a boom in demand . . . ." See email chain ending with Jack Bernens, dated October 29, 2010 and attaching and discussing Reuters article.

104.    Evidence of China's importance continued to mount prior to planting in 2011.

105.    In January 2011, Syngenta employees prepared written responses to questions posed by Thrive Magazine, responding to one of the questions: "China has moved from an insignificant [sic] importer of U.S. corn to the second most important market for U.S. corn." See January 25-26, 2011 email chain between Charles Lee and Dianne Mayhart.

106.    The USDA's long term projections, compiled in November 2010 and issued in February 2011, forecast dramatic increases in China's imports of corn from the USDA's prior year's projections. As stated by the USDA, the "increase in China's imports account for one-third of the growth in world corn trade."

107.    On February 9, 2011, the CEO of Syngenta AG, Mike Mack, stated that China's "import requirements alone influence global commodity prices." Syngenta 2010 Full Year Results, Remarks of Mike Mack.

108.    On February 25, 2011, Syngenta's Head of Industry Relations corresponded with the Head of Syngenta's Southeast Asian Territory as follows:

> I believe I have discussed with you several times about our risk with MIR162 and not having approval in EU and China. I have been getting more questions from traders . . . lately and [Charles Lee, Head of Corn for North America] wanted me to be sure you understood the potential risk for China.

109.    At the time it was marketing and selling Agrisure Viptera® – and before planting in 2011 – Syngenta clearly knew of China's importance.

110.    Syngenta could, and should, have waited to market Agrisure Viptera®. It also could, and should, have withdrawn it from the market before planting but did not.

111.    To the contrary, and despite the risks, Syngenta Seeds sold Agrisure Viptera® to

approximately 12,000 corn producers with a projected yield estimated in September 2011 of 250 million bushels. See Syngenta v. Bunge, 820 F. Supp. 2d 953, 958 (N.D. Iowa 2011). Viptera® growers could be found in nearly every state such that the market for Viptera® products was very broad across the U.S. See id. at 963. Syngenta projected Agrisure Viptera® seed sales would exceed twenty percent (20%) of the U.S. corn seed market in future years. See id. at 958.

112. Other published estimates indicate that during the 2011 crop year, Agrisure Viptera® had been planted on 1.1% of the acres in the U.S. on which corn had been grown. See Paul Christensen, Chinese Approval of Syngenta Agrisure Viptera®, Seed in Context Blog: Commentary of the World of Seed. (http://intlcorn.com/seedsiteblog/?tag=syngenta).

### SYNGENTA'S CONTINUING IRRESPONSIBILITY AFTER 2011 PLANTING

113. After planting, but before harvest in 2011, the importance of China, and the risk of MIR162 contamination and market disruption, continued to grow.

114. A July 13, 2011, internal e-mail attached a news article projecting that China "will probably buy 5 million metric tons this year from 2 million tons in 2010." July 13, 2011 email from Paul Minehart to Charles Lee and others.

115. On July 22, 2011, Syngenta's CEO Mack stated: "The need to improve yield and quality is present across all emerging markets in the region, although it's China which continues to have the greatest impact on world markets, with increasing imports not just of soybeans but also now of corn." July 22, 2011 Transcript of Remarks See http://www.syngenta.com/global/corporate/SiteCollectionDocuments/pdf/transcripts/H1-2011-results-transcript.pdf.

116. An internal August 16, 2011 e-mail from Syngenta's Trait Marketing Manager, Quinn Showalter, confirms that Syngenta was well aware of the increased importance of China as a corn importer:

> The issue that has surfaced is that China has become a larger corn importer after the planting season finished. China placed initial large orders including the 2011 corn crop with grain handlers around the first of July of this year. Last year, the U.S. exported 1.7 million tons of corn to China. That number is expected to increase 50% this year to 3 million tons - - the highest import quantity in 16 years.

*Id.*

117.    Of course, the fact that China would be a significant importer in 2011 had not just "surfaced," but had been known by Syngenta for some time.

118.    In August 2011, still before the first commercially grown corn planted with the MIR162 trait had been harvested, NGFA and NAEGA issued a Joint Statement warning Syngenta about MIR162:

> U.S. farmers, as well as the commercial grain handling and export industry, depend heavily upon biotechnology providers voluntarily exercising corporate responsibility in the timing of product launch as part of their product stewardship obligation . . .The negative consequences of overly aggressive commercialization of biotech- enhanced events by technology providers are numerous, and include exposing exporting companies to financial losses because of cargo rejection, reducing access to some export markets, and diminishing the United States' reputation as a reliable, often- preferred supplier of grains, oilseeds and grain products. Premature commercialization can reduce significantly U.S. agriculture's contribution to global food security and economic growth.
>
> Putting the Chinese and other markets at risk with such aggressive commercialization of biotech-enhanced events is not in the best interest of U.S. agriculture or the U.S. economy.

119.    As stated by these associations: "The grain handling and export industry have communicated consistently, clearly and in good faith with biotechnology providers and seed companies about the importance of biotech-enhanced events in commodity crops receiving regulatory approvals or authorizations -- prior to commercialization -- in key export markets where foreign governments have functioning regulatory systems that approve biotech-enhanced traits. These communications regarding key export markets, identified through market and trade assessments, have been conveyed through industry trade associations and in direct

34

communications by individual companies." Id.

120.    At least by September 2011, Syngenta's business partners were saying that China

was a "major importer" of U.S. corn. See September 16, 2011 email from Clayton Becker.

121.    A report from U.S. Grains Council President Thomas Dorr on his July 2011 trip to

China, obtained from Syngenta's document production, was equally blunt:  "The likelihood of

U.S. corn entering the China market with this unapproved market is substantial." See Thomas

Dorr, U.S. Grains Council Trip Report (July 22, 2011) at 1.

122.    That warning was very valid. Not only did Syngenta commercialize Agrisure

Viptera® prematurely, it did so without adequate systems in place to either isolate MIR162 or

channel it away from markets, including China, from which approval was not obtained.

TRANSGENIC CONTAMINATION

123.    Corn, or maize, has staminate (male) and pistillate (female) flowers on the same

plant and is wind pollinated. While there is some possibility of self-fertilization, corn generally is

considered an outcrossing species. Under normal field conditions some 95% of the ovules are

fertilized by pollen from other plants. Pollen is released in large quantities. "Individual corn

plants produce 4 to 5 million pollen grains. Therefore, even if only a small percentage of the total

pollen shed by a field of corn drifts into a neighboring field, there is considerable potential for

contamination through cross pollination." Thomison, Managing "Pollen Drift" to Minimize

Contamination of Non-GMO Corn, Ohio State University Extension Fact Sheet.

124.    "Once released from the tassels into the air, pollen grains can travel as far as 1⁄2

mile (800 m) in 2 minutes in a wind of 15 miles per hour (27 km/h) (Nielsen 2003b)." Kent

Brittan, Methods to Enable the Coexistence of Diverse Corn Production Systems, University of

California. Studies indicate that "cross-pollination between cornfields could be limited to 1% or

less by a separation distance of 660 feet (200 m), and to 0.5% or less by a separation distance of 984 feet (300 m). However, cross-pollination frequencies could not be reduced to 0.1% consistently, even with isolation distances of 1,640 feet (500 m)." Id.

125.    The Association of Official Seed Certifying Agencies (AOSCA) recognizes that "[a]lthough most corn pollen is deposited near its origin, isolation by very long distance (several miles) from any other corn is probably the only means of assuring complete confinement other than assuring complete asynchrony of flowering." However, "[t]he matter of whom or what entity controls the area constituting a proposed isolation zone and beyond could be crucial and/or problematic to successful confinement. AOSCA Report at 62.

126.    Assuring "complete asynchrony of flowering" also is fraught with shortcomings. For example, "[d]ifferences in maturity between the early and late hybrid may not be large enough to ensure that the flowering periods of each hybrid will not overlap, especially when certain climatic conditions may accelerate or delay flowering. This strategy will only work if [the farmer] control[s] the adjacent fields or can closely coordinate [his] corn planting operations with those of [his] neighbors." Thomison, Managing "Pollen Drift" to Minimize Contamination of Non-GMO Corn, Ohio State University Extension Fact Sheet.

127.    In addition, "[p]lanting operations to control pollen drift are only part of the process of producing an IP corn grain crop." Id. Other major issues include harvesting, storage, and commingling within the production and supply chain.

128.    "Different corn breeds within an individual farm are commingled at the harvesting stage. Corn from hundreds of thousands of farms is then further commingled as it is gathered, stored and shipped through a system of local, regional and terminal grain elevators. Elevators, storage and transportation facilities are generally not equipped to test and segregate

corn varieties. The commingled corn is then marketed and traded as a fungible commodity." In re StarLink Corn Products Liability Litig., 212 F. Supp. 2d 828, 834 (N.D. Ill. 2002).

129.    As a developer of genetic events, including genetically engineered corn, Syngenta knew or certainly should have known the very high likelihood that if commercialized, MIR162 would disseminate throughout the supply chain – in fields, storage and transportation – via the numerous routes that transgenic contamination occurs.

130.    One Syngenta representative stated: "The primary issue at hand through this entire situation is that many growers probably do not know where their Agrisure Viptera is planted (making segregation nearly impossible)." August 23, 2011 email from Eric Anderson to Eric Carlson.

131.    Syngenta acknowledged to Cargill that "some commingling" of Viptera® with non-Viptera® corn would occur at harvest in the fall of 2011. See August 30 - September 1, 2011 email chain between Charles Lee (Syngenta) and Randy Giroux (Cargill).

132.    Before commercializing MIR162, Syngenta also knew the risk that MIR162 would move into export channels from planting and harvest of MIR162, knew the risk was significant, and knew that detection of MIR162 in markets lacking approval created significant risk of trade disruption. See, e.g., October 31, 2009 email from David O'Reilly (discussing planting of MIR162 in Brazil, which gave approval, the "significant risk MIR162 will be detectable in export channels before EU approvals" and "risk of disruption of Brazilian corn . . . because of detection of MIR162").

133.    Syngenta knew that MIR162 in the U.S. "could be in export channel[s]" and "be detectable in export channels" by 2011. See MIR162 & EU approvals Powerpoint attached to October 31, 2009 email from David O'Reilly.

**134.**    Syngenta's Charles Lee admitted in his deposition in Syngenta v. Bunge that there was a "real risk" that China would reject grain shipments due to the presence of unapproved genetically modified traits. See Charles Lee Deposition (Sept. 7, 2011) (Bunge) at 94-95.

**135.**    Syngenta, however, took few to no steps to assure that MIR162 would not enter the U.S. corn supply through cross-pollination and/or commingling in fields, and took wholly inadequate steps to prevent commingling within grain elevators or otherwise within the supply chain as described below, virtually assuring that MIR162 would contaminate the U.S. corn supply in every way possible.

### SYNGENTA'S NONSENSICAL AND INEFFECTIVE "STEWARDSHIP" PROGRAM

**136.**    Syngenta's representation in its MIR162 Deregulation Petition that the "ability to channel particular types of maize for particular uses such as the export market" is demonstrated by success in the "specialty maize market" is grossly misleading. In specialty markets like organic farming, the grower receives a premium and as such, takes the onus on himself to isolate his specialty corn crop from transgenic contamination from neighboring fields (such as spatial and temporal isolation and detasseling). See Thomison, Managing Pollen Drift in Maize Seed Production, Department Horticulture and Crop Science, Ohio State University ("Growers of value added identity preserved (IP) grains need to control pollen contamination in order to optimize expression of value added traits in specialty maize and thereby obtain premiums.").

**137.**    The specialty seller also markets to a specialty buyer to whom he channels. Both have incentive to take all measures necessary to avoid contamination by non-specialty corn. The growing, marketing and distribution system of commodity corn is vastly different. A "Commodity Crop" is "a crop which in the ordinary course is grown using common agricultural practices and is commingled and not segregated for special handling or use when it enters the

chain of commerce." BIO, Product Launch Stewardship: Food and Agriculture Section (Nov. 27, 2012) at Annex 1 Introduction n.3.

138.    Syngenta knew that the commodity market is different than the specialty market. On October 26, 2007, Syngenta's Sarah Hull circulated internal Questions & Answers for upcoming meetings. One anticipated question was: "It seems that Syngenta believes a closed loop system is workable to keep unapproved product completely away from export channel . . . What do you think?" Syngenta's prepared answer was: "For specialty grain, not commodity grain, we do believe a closed loop, dedicated grain management system can work because the grain is contracted for a specific use and a specific end user." See October 26, 2007 email from Sarah Hull to Jeff Cox and others, attaching "Potential Q/A for JZZ and MAFF Meetings" (emphasis added).

139.    The difficulties with channeling are illustrated by the infamous "StarLink" contamination in 2000 that was the subject of significant litigation. See In re StarLink Corn Products Liability Litig., 212 F. Supp. 2d 828 (N.D. Ill. 2002). That is particularly true where, as in this case, millions of acres of the commodity to be channeled – MIR162 corn – were planted all across the U.S. Syngenta did not make even minimally reasonable efforts to do so.

140.    While misleading, Syngenta's representations to the USDA illustrate Syngenta's awareness of the kind of system designed to avoid contamination. Well-known measures in specialty markets include specifying strict containment protocols by contract (e.g., cleaning combines and storage areas, isolation distances, dedicated facilities, and inspections), and tracing the product through the supply chain.

141.    Syngenta, however, did not take meaningful steps to even minimize the risk of pollen-mediated gene flow and commingling of Agrisure Viptera® with non-Viptera corn.

**142.**    Responsible stewardship procedures include, at minimum, "generally accepted best seed quality practices designed to prevent low level presence of unauthorized products and [to] minimize unintended incidental presence of products authorized in the county of production" and "[m]ak[ing] available prior to commercialization a reliable detection method or test for use by growers, processors and buyers that enables crop identity verification for intended use." See BIO, Product Launch Stewardship (December 10, 2009) at Annex 1, Policy Guidance; BIO, Stewardship Actions to be Taken Prior to Launching Special Traits (October 4, 2010) at Annex 1, Policy Guidance; BIO, Product Launch Stewardship: Food and Agriculture Section (November 27, 2010) at Annex 1 Policy Guidance.

**143.**    In its own 2007 launch policy, Syngenta represented that "[w]e will make available prior to commercialization a reliable detection method or test that enables event identity in the crop." BIO Product Launch Policy, Syngenta Implementation Principles (November 2007).

**144.**    In July 2010, Syngenta executives discussed methods for detecting genetically modified traits, sharing "one of the stories on MIR162 for why we need a GMOD [genetically modified organism detection] strategy." That story noted that "[a]symmetric approval of Agrisure Viptera in one territory and other territory may affect the free flow of product trade." See July 20, 2010 email from Jingwen Chen to Alejandro Tozzini et al.

**145.**    Syngenta discussed, but rejected, issuing strip test kits to processing facilities and other grain handlers to reduce the risk of MIR162 entering facilities that exported to unapproved markets despite the fact that the test kits cost approximately one dollar each. See August 15-16, 2011 Email Chain Subject: Risk Management. Nor did it provide another test method to farmers or grain handlers as part of a required stewardship program.

146.    Syngenta also could have contractually required Viptera® growers to adhere to stringent practices that would have decreased the likelihood of contamination. Syngenta did not, however, because to do so would have drastically reduced or eliminated product sales.

147.    Instead, and contrary to requiring isolation, Syngenta Seeds gave away free bags of Viptera to farmers as part of a campaign to encourage them to grow Viptera® side-by-side with other corn to compare performance. See Syngenta, 820 F. Supp. 2d at 958.

148.    Syngenta expected the Viptera® corn to cross-pollinate with non-Viptera corn and, according to Charles Lee, told farmers to consider the adjacent corn Viptera® corn. See Charles Lee Deposition (Sept. 7, 2011) (Bunge) at 221-23. Yet, there was no contractual requirement for growers to take measures to prevent such cross-pollination in their own fields, segregate Viptera® from non-Viptera® corn, or prevent contamination of other farmers' fields.

149.    In fact, Syngenta advised at least one grower that he had no obligation to tell neighboring corn farmers or grain originators that he had planted Viptera®. This advice was in response to the farmer's concern that he might be liable if his Viptera® corn cross pollinated with his neighbor's corn. See September 27, 2011 email from Matt Tenhaeff.

150.    Upon information and belief, in addition to the acreage upon which Agrisure Viptera® (and later, Duracade™) have been grown from sales of those products, Syngenta has grown corn on land within the U.S. containing the MIR162 trait for purposes of seed increase and to develop inventories of product to sell to farmers.  This additional growth further increased the presence of MIR162 within U.S. agriculture, and the widespread, pervasive contamination that the U.S./China corn trade.

151.    Syngenta knew the risks. In a June 2010 "Risk Management Report," Syngenta recognized that "MIR162 [would be] detected as unapproved trait" as a consequence of large

scale production "before all import approvals are in place." The report recognized that increased

production in 2010 of corn containing MIR162 increased the "likelihood of MIR162 being

detected as [adventitious presence] in an export channel." Syngenta classified the impact of this

risk as "high." Risk Management Report dated June 2010. See also MIR162 & EU approvals

Powerpoint attached to the October 31, 2009 email from David O'Reilly.

**152.**    Syngenta's commercial sales of Agrisure Viptera® for planting, growing, and

harvest in 2011 reached across the United states, covering nine hundred nineteen (919) counties

and thirty-eight (38) states. See Unit Stats by State and County, Viptera Only (Lee Bunge

deposition exhibit); see also Syngenta v. Bunge, 820 F. Supp. 2d at 958; 963. Despite the

pervasive presence of Agrisure Viptera® and Syngenta's knowledge of the risks, Syngenta did

not require growers to comply with the kind of strict measures Syngenta knew were minimally

necessary in order to even have a chance at containment.

**153.**    Syngenta's professed "channeling" efforts, which could and should have been in

place well prior to harvest in order to direct Agrisure Viptera® away from markets lacking

import approval, also were wholly – and purposefully – inadequate.

**154.**    In its 2007 MIR162 Deregulation Petition, Syngenta represented that a lack of

Chinese approval would not pose a problem for U.S. farmers because:

> Syngenta's stewardship agreements with growers will include a term  requiring
> growers to divert this product away from export markets (*i.e.* channeling) where
> the grain has not yet received regulatory approval for import. Syngenta will
> communicate these requirements to growers using a wide-ranging grower
> education campaign (*e.g.*, grower Stewardship Guide) . . . [T]hese procedures are
> not hypothetical.

**155.**    Syngenta's "stewardship" program, however, did indeed present "hypothetical"

and ineffective procedures, which made contamination of the U.S. corn supply virtually certain.

**156.**    Contrary to representations in its MIR162 Deregulation Petition, Syngenta did

not, on information and belief, institute a "wide ranging grower education campaign" through its Stewardship Agreements, Stewardship Guides or otherwise, and certainly did not do so in a manner that would be meaningful and effective.

157. On information and belief, none of Syngenta Seeds' Stewardship Agreements with growers contained any details on Syngenta's stewardship program. Instead, the agreement provided that growers should comply with the "most current" version of a "Stewardship Guide," which might or might not be given to them when they received the product, and was subject to unilateral change at any time via modification to a website. See Syngenta Seeds Stewardship Agreement (Revised Aug. 2009) at 1; Syngenta Seeds Stewardship Agreement (Revised March 14, 2011) at 1; Syngenta Seeds Stewardship Agreement (Revised May 5, 2011) at 1; Syngenta Seeds Stewardship Agreement (Revised June 5, 2013) at 1.

158. In other words, Syngenta's "stewardship" program for Agrisure Viptera® depended, at the outset, on thousands of individual farmers across the country locating and understanding a Stewardship Guide, which they may well not have been provided at the time of signing the Stewardship Agreement or receiving the product.

159. Moreover, while the Stewardship Agreements contained a provision for "channeling," they did not mention China.

160. The 2009 version of the Stewardship Agreement provided that the grower "agrees to: Channel grain produced from seed to appropriate markets to prevent movement to markets where the grain has not received regulatory approval for import." It does not, however, identify China as one of those markets. Rather, the Agreement states that: "Grain harvested from corn hybrids containing Agrisure Technologies . . . may not be fully approved for grain export to Japan or the European Union" and that "grain from hybrids that do not have the appropriate

import approvals from Japan and the European Union must be directed to domestic uses and away from export channels." Syngenta Seeds Stewardship Agreement (Revised Aug. 2009) at 2. There is no reference to any other unapproved markets, including China.

161.    The March and May 2011 versions of the Syngenta Seeds Stewardship Agreement said – and did not say – the same thing. *See id.* (Revised March 14, 2011) at 1, 2; Syngenta Seeds Stewardship Agreement (Revised May 11, 2011) at 1, 2.

162.    Syngenta Seeds' 2013 version of the Stewardship Agreement removed the reference to Japan and the European Union, but even then did not mention China. See Syngenta Seeds Stewardship Agreement (Revised June 5, 2013).

163.    None of the agreements contain any instruction on how a corn producer was supposed to "channel."

164.    And Syngenta knew or should have known that bare reference to channeling (and at that, without reference to China) was ineffective. Syngenta itself has stated: "Contracts are not carefully reviewed or understood." See Syngenta document entitled The Role of Grain Marketing for Future Trait Technologies.

165.    In any event, and to the extent other versions of the Stewardship Agreement (or Stewardship Guide) actually reference China, the concept of "channeling" by thousands of individual corn farmers under Syngenta's non-existent or – at minimum, inadequate – "stewardship" program was destined to fail.

166.    "Channeling" can only work if all grain handlers and others in the supply chain are engaged in that endeavor. For example, BIO recognizes that a realistic assessment of conditions related to handling, distributing, processing and testing products must engage the various stakeholders. See BIO, Product Launch Stewardship (December 10, 2009) at

Introduction.

167.    Upon information and belief, Syngenta did not obtain channeling commitments

from supply chain participants, took no further action to create a marketing plan or channeling

mechanism, or coordinate with grain handling, export and other post-harvest firms, to ensure that

Agrisure Viptera® corn was not directed to markets for which regulatory approval had not been

received, including China.

168.    This failure was purposeful. Syngenta made a decision that no special provisions

would be made for grain redirection. In the summer of 2010, David Morgan agreed – reluctantly

- to approve sending MIR162 seed planted prior to Japanese approval to a feedlot instead of

placing it into the grain channel if Syngenta did not have to pay for it: "To be clear, if we can do

this with zero cost and minimal effort and this keeps everyone 'quiet,' then why not?  If

otherwise then I personally don't care about channeling." See June 18, 2010 email chain

including David Morgan and Jack Bernens.

169.    Not only did Syngenta not take measures to channel Agrisure Viptera®, it sought

to stop exporters and grain elevator operators from attempting to "channel" Agrisure Viptera®

away from China. In fact, Syngenta filed a lawsuit against Bunge, a grain elevator operator that

refused to accept Agrisure Viptera® corn because Bunge exported corn to China.

170.    On August 17, 2011, Syngenta sent a letter to Agrisure Viptera® producers

expressing disappointment that Bunge and Consolidated Grain & Barge would "not be accepting

grain with the Agrisure Viptera® trait." Syngenta recommended that the producers "[d]eliver[] to

elevators accepting grain with the Agrisure Viptera® trait."  But Syngenta did not mention that

these elevators should channel the grain to markets in which the trait had been approved.

171.    Syngenta Seeds sued Bunge in Syngenta v. Bunge complaining that Bunge could

not refuse to accept Agrisure Viptera® corn at its elevators. Bunge had posted notices at its grain elevators that it would not accept Agrisure Viptera® corn because the MIR162 trait was not approved in China, China had a zero tolerance policy regarding non-approved GMO events such as MIR162, and Bunge had significant contracts with Chinese markets which it wanted to fulfill.

172.    Syngenta Seeds filed the suit seeking an injunction to require Bunge to accept the Agrisure Viptera® corn despite: (i) its earlier representations in the MIR162 Deregulation Petition that corn grown with its MIR162 trait would be channeled away from export markets which had not yet approved of its importation; (ii) the requirement in its Stewardship Agreement with producers that had purchased Agrisure Viptera® seed requiring them to channel their corn away from export markets that had not yet approved the importation of MIR162 corn; and (iii) the above-referenced protocols approved by BIO and other organizations in which Syngenta was/is a member requiring consultation with industry stakeholders and not commercializing new seed traits without major market approval.

173.    At the end of the 2010 crop year, in August 2010, China had already become the seventh largest importer of U.S. corn. See Syngenta, 820 F. Supp. 2d at 860-61. Thereafter, in the spring of 2011, Bunge had sold millions of dollars of U.S. corn for delivery to China between September 2011 and January 2012. Id.

174.    The court, in Syngenta v. Bunge, denied Syngenta Seeds' requested injunction on September 26, 2011, finding it was foreseeable that China would not approve importation of MIR162 during the 2010-2011 crop year, U.S. exports to China might be significant, and Syngenta Seeds had caused the very harm about which it complained. The court refused to shift the risk to Bunge for commercializing Agrisure Viptera® prior to its approval by China, concluding, inter alia, that:

> At least to some extent, Syngenta's reputational injuries [allegedly caused by Bunge's refusal to accept Agrisure Viptera®], thought significant, [were] the result of *Syngenta's* decision to commercialize Viptera corn before obtaining import approval from significant import markets, including China, where Bunge's rejection of unapproved traits was not wholly unforeseen or unforeseeable . . . .

*Id.*, 820 F.Supp.2d at 988. The Court also concluded that:

> [N]o reasonable balance of equities would impose upon Bunge the prodigious additional expense of segregating Viptera corn (or segregating non-Viptera corn earmarked for Chinese export), where Bunge did not create the situation in Viptera corn has not been yet approved for import to China. That situation arises entirely because Syngenta decided to commercialize Viptera corn knowing that it not yet have Chinese and some other import approvals and would not have them for the 2011 crop year, and under circumstances in which Syngenta should have reasonably recognized that Chinese imports of United States corn for the 2011 crop year might well be very significant. Syngenta accepted the risk of commercializing Viptera corn, albeit with more than the required or recommended import approvals, but without import approval from all of the reasonably likely foreign markets. I reject Syngenta's request that I shift that risk, instead, to Bunge . . . .

*Id.* at 990. In addressing the public interest element for injunctive relief, the Court declined to shift the risk of the decision to commercialize MIR162 away from Syngenta:

> I find that the public interest strongly favors allocating the risks of a decision to introduce a new transgenic grain into the commercial market on the company that decided to commercialize that grain before obtaining all import approvals . . . .

*Id.* at 992.

**175.** The Court also found that in the late summer and fall of 2011, exporters other than Bunge, including Cargill and Archer Daniels Midland ("ADM"), also had refused to accept Agrisure Viptera® at some of their facilities due to export market issues, such as the failure of Syngenta to receive approval from the European Union. Id. at 962.

### SYNGENTA'S IRRESPONSIBILITY AND MISREPRESENTATIONS INTO THE 2012 CROP YEAR

**176.** Despite the risk of contamination and movement of Agrisure Viptera into export markets, Syngenta continued its course and sold even more Agrisure Viptera® for planting in 2012, further increasing such risks.

177.    And Syngenta expanded sales of Agrisure Viptera® even as China was dramatically increasing imports of U.S. corn and projected to be the largest importer of U.S. corn by the year 2020.

178.    In 2011, Syngenta sold Agrisure Viptera® for the 2012 growing season.

179.    But Syngenta was concerned. If grain handlers like Bunge refused to take Agrisure Viptera®, the lack of approval from China might reduce its sales.

180.    So on June 29, 2011, Syngenta's Head of Industry Relations warned several Syngenta executives:

> All, just want to continue to let you know the questions about MIR162 continue to increase both on EU and China. Today at NGFA meeting [a Cargill executive] said his export business is really wound up about China and MIR162 not being approved. I predict we are going to have some rough water around MIR162 until China and EU are approved.

*See* June 29, 2011 email from Jack Bernens to Charles Lee, Sarah Hull, and David Morgan.

181.    On July 1-5, 2011, Syngenta's Sarah Hull and others exchanged emails that grain exporters were beginning to announce their refusal to accept Viptera® from producers because of the threat posed by the lack of China's approval. See July 1, 2011 email from Jack Bernens to Sarah Hull, David Morgan, and Charles Lee ("The signs are starting to go up!"); July 5, 2011 email from Sarah Hull to Ponsi Trivisvavet.

182.    Syngenta's management team had been in meetings with representatives from China, and acknowledged the risk. See July 4, 2011 emails between Andrew McConville, Sean Wang, and Sarah Hull. On July 2, 2011, Syngenta's Head of Industry Relations sent an email to Syngenta management, stating: "[A]s you know I have been warning of this pending potential development for some time . . . China has become a substantial market and we could see this was going to happen."  See July 2, 2011 email from Jack Bernens to Grant Ozipko.

**183.** Syngenta also knew by July 2011 that China would not change its zero-tolerance policy. On July 5, 2011, Syngenta's head of Corporate Affairs China informed the management team: "With regard to the MoA officials . . . they reiterated . . . that at present stage, MoA will not change the GMO safety certificate (for processing) issuing system." See July 5, 2011 email from Wang Sean to Andrew McConville and others.

**184.** Syngenta, however, chose not to inform growers and the grain industry about the growing danger. Instead, it crafted a plan to mislead grain handlers and growers to believe that Syngenta would have import approval from China by the time Viptera® was harvested despite all indications to the contrary. The purpose of the plan, of course, was to sell more Viptera®.

**185.** On July 5, 2011, Sarah Hull emailed:

> Not sure on the approval timeline . . . We get daily questions from the other grain traders about China and EU (Brazil trade) approvals. . . Most important is that we get them comfortable that the approval is close so they don't not only tell farmers not to bring their 162 varieties to them but also not to buy the varieties for planting next year.

See July 5, 2011 email from Sarah Hull to Ponsi Trivisvavet.

**186.** United States Grains Council President, Tom Dorr, in an August 2, 2011 memorandum to "Seed Technology Members" emailed to Syngenta, stated that 'the current situation regarding the commercialization of unapproved events in China has raised industry-wide concern about potential near and longer-term disruption to US corn exports in China." In the same memorandum, he referred to China as a "major corn importer."

**187.** By at least early July 2011, Syngenta was already managing its message and had scripted its responses.

**188.** Among other things, Syngenta launched a "blame the grain trade" campaign. On July 7, 2011, Syngenta's Sarah Hull stated:

> Channeling is exactly what these guys [grain handlers] need to accept as the way
> forward in general. Will be interesting to hear what Cargill says since they feel they
> are better at managing logistic challenges than anyone else. I think we have to find
> the right balance of making this a 162 problem versus an evolutionary challenge of
> global grain trade and adjust our actions to reflect the latter.

See July 7, 2011 email from Sarah Hull to David Morgan and others.

189.    Syngenta remained focused on its bottom line. Addressing a suggestion that its work "with the grain channel to avoid issues with introductions of new trait technologies," a Syngenta executive responded: "(you don't need to spend a lot of time on it) but what may not have been driven home yet is how much this potentially will cost Syngenta, how much the China thing has and IS costing Syngenta, and what it's done to sales/field perceptions." See October 12, 2011 email exchange between Jill Wenzel and John Fisher.

190.    Syngenta internally communicated its Yields Without Borders Program and its Top 10 Tactics to Energize Sales Force and Leverage Grain Marketing Channels to Secure Sales. See Syngenta document entitled The Role of Grain marketing for Future Trait Technologies. Part of this program was to provide regular (and misleading) updates "on progress and plans for China trait approval and to drive trait acceptance." Id.

191.    This was in response to, among other things, complaints by producers that they were not informed properly about issues with Agrisure Viptera® when they ordered seed. Id.

192.    Syngenta's goal was, among other things, to develop a "strategy moving forward to neutralize grain-marketing related barriers to acceptance of Agrisure Viptera." Id.

193.    Syngenta's objectives included the "introduction of new trait technologies to maximize IP [intellectual property] protection window and realize income sooner on R&D investment," and addressing Syngenta's "black eye" in regard to "issues of technology acceptance and grain marketing." Id.

194.    In order to encourage further sales and planting of Agrisure Viptera®, Syngenta, by at least August 2011, was representing to stakeholders, including corn producers, that it would obtain China's approval by March 2012. See, e.g., August 17, 2011 Syngenta Letter to Viptera Growers ("[W]e are still awaiting import approval from China, which we anticipate in late March 2012" and that Chinese approval is "expected late March 2012.").

195.    As one of Syngenta's business partners observed: "communication, communication, communication, over and over to growers is needed, even if it is repetitious information is needed to hold Agrisure Viptera orders . . . [and to create] pull through interest in seeds tock orders for planting the 2013 crop. If we say March enough, there should be no issue in ordering seed stock and seed companies will have confidence in the March date." See November 30, 2011 email from Don Kestel.

196.    Syngenta, however, did not have a reasonable basis to believe that approval from China would be received in March 2012 and, in fact, did not actually expect approval by then.

197.    On July 8, 2011, the Head of Syngenta's Southeast Asian Territory wrote to Syngenta's Head of Corn for North America:

> **Viptera China**: I'm really concerned whether Q1/Q2 2012 is still achievable. Could we talk on this still?

*See* July 8, 2011 email from Ponsi Trivisvavet to Charles Lee.

198.    Indeed, Syngenta's approval submissions to China included insufficient, incorrect and/or incomplete information, resulting in multiple additional submissions. There also were significant delays by Syngenta in providing standard information to the Chinese agricultural authorities. For example, Syngenta did not submit PCR detection methods until January 10, 2011, but had to redeliver the PCR detection method on May 16, 2011 because the first submission was unclear. This information was a required precursor to testing in China, which

may take – and is expected to take – months.

199.    On June 22, 2011, Syngenta sent a letter of correction regarding mislabeling of samples. Testing did not begin in China until June 24, 2011. Testing results are known requirements of completed applications. Even after an application is complete, review and deficiency notices, requiring correction, are not atypical, but expected.

200.    In a July 6, 2011 email to Syngenta Executive Charles Lee, Lisa Zannoi admitted: "We had a year delay due to an internal restriction on shipping seeds to China needed to start the field testing." See July 6, 2011 email from Zannoni to Lee.

201.    At least by July 2011, Syngenta knew it could not expect approval by China by March 2012. In fact, Syngenta's own employees recognized that approval would take significantly longer.

202.    For example, on July 1, 2011, Brian Walsh emailed Katie Gutzmann that Agrisure Viptera® would not receive approval by China "for a few years yet." See July 1, 2011 Brian Walsh email to Katie Gutzmann. "The good news is that most of Monsanto's new traits aren't approved either . . . All other major countries approved Viptera." Id.

203.    In a July 5, 2011 discussion of this topic, Quinn Showalter asked: "Do you have any insights regarding when [Monsanto] might get approval . . . If they aren't being restricted by [Consolidated Grain and Barge], it may be due to an anticipated approval vs. ours which I believe is anticipated in 2014." See July 5, 2011 email from Quinn Showalter to Araba Miloud.

204.    Syngenta received field trial and safety test results in October and November 2011, respectively. Syngenta submitted these results on November 9, 2011. At that point, Syngenta knew or clearly should have known that it would not have approval by March 2012.

205.    As of May 2012, China's Ministry of Agriculture had reviewed Syngenta's

application, and rejected it due to multiple deficiencies, including all applicable safety analyses.
Syngenta submitted another application in June 2012.

206.    On information and belief, Syngenta also sought approval to cultivate MIR162 in
China. See Update 1 – Syngenta Confirms it Applied to cultivate GMO Corn in China, Reuters
(Oct. 8, 2014) (http://www.reuters.com/article/2014/10/08/china-gmo-syngenta-
dUSL3N0S317520141008); APAC Regulatory Strategy for Cultivation Approval (Jan. 19,
2009).

207.    Upon information and belief, China has more severely restricted the right to
cultivate bio-engineered crops than to import them, had not previously allowed any such
cultivation by a foreign firm without Chinese participation, and has taken significantly longer to
approve cultivation applications than importation applications—all of which materially delayed
import approval. In fact, Syngenta was projecting that cultivation approval would not be
obtained until 2016. See January 19, 2009 APAC Regulatory Strategy for Cultivation Approval.

208.    Syngenta continued to downplay the importance of China and misrepresent the
status of China's approval of Viptera® to U.S. producers for the purpose of increasing its sales.

209.    Syngenta was far more focused on a potential loss of profits than it was on the
risk of trade disruption caused by Agrisure Viptera®.

210.    At that time, Syngenta was analyzing the potential of Viptera® purchasers
returning seed similar to its 2007 experience when it commercialized MIR604 prior to Japanese
approval. See November 9, 2011 email from John Fisher to Jack Bernens and others. Syngenta's
Product Lead for Commercial Traits took glee at the fact that a U.S. seed shortage would work in
Syngenta's favor, forcing growers to "roll the dice" with Viptera:

> One heads-up from today's Agrisure Viptera core team call – approx. 750,000 of
> our approx. 1MM units are already ordered and we anticipate the remainder will be

ordered by year's end. The industry- wide short supply of seed will work in our favor. . . . Hence key business issue is more the black-eye we now have, vs. actual impact on sales. . . .

*The issue will be if they [growers] return it, they likely won't be able to replace it. Poor things will have to roll the dice.*

*See* November 11, 2011 email from Jill Wenzel to John Fisher and Jim Gresham.

**211.**    As Syngenta continued to make its misrepresentations and the presence of Agrisure Viptera® continued to spread, so did the risk of contamination of the U.S. corn supply with MIR162 – and the risk of market disruption. And Syngenta knew it. On July 11, 2011, Syngenta's Head of Global External Affairs, Sarah Hull, emailed other Syngenta executives regarding a plan devised with Syngenta's Michael Mack to convince China to speed up its approval. Mr. Mack "want[ed] the Chinese to know that every ship carrying corn into China this fall will have 162 in it at some level." See July 8, 2011 email from Sarah Hull to Charles Lee (cc: David Morgan). Ms. Hull asked for information to verify numbers supporting that message:

I need to pull some numbers together to make this a fact-based argument and wondered who could help me. We know that US plantings of [MIR]162 = 540,000 bags, representing 1.6% of the total corn market. I assume this is consistent with your citing ¼ billion bushels of Viptera grain is in fields today, but will you verify these facts?

*Id*.

**212.**    Ms. Hull acknowledged that (contrary to earlier representations to the USDA that MIR162 could be effectively channeled like specialty maize), the ability to channel in a "closed loop" system is much different than a commodity crop. She noted: "I know we need to be careful not to undermine our position that we can successfully grow products in closed loop systems such as Enogen [corn developed by Syngenta for ethanol production], but I think we have to do what we can to get China to speed up this review." Id.

**213.**    The plan was for Syngenta to compare prior Syngenta contamination incidents

(MIR604 and Bt10 corn) with the presence of MIR162 in the U.S. corn supply in order to show with dispersion modes "that under 0 tolerance even very little in the system had extensive hits." This, Ms. Hull said, should convince U.S. Government officials to convey to Chinese officials the need to approve MIR162 "or put US corn trade at serious risk." Id.

### SYNGENTA'S CONTINUED DECEPTION REGARDING CHINA'S APPROVAL OF MIR162

214.    Syngenta continued its deception regarding the status of approval from China throughout 2012.

215.    Despite knowing that its incomplete and delayed regulatory filings with China guaranteed it would not obtain import approval for Viptera® by March 2012, Syngenta nevertheless instructed its employees to tell grain handlers: "We are still on schedule to obtain approval from China by March of 2012 . . . we have not received any indication that China approval will be delayed." See January 2, 2012 email from March Sather.

216.    After the first quarter 2012 had passed without approval from China, Syngenta told its employees to "verbally" (emphasis in original) communicate that Syngenta "continue[s] to anticipate that this approval will be received shortly." See April 8, 2012 email from Lori Thomas to DL NAFTA list serve et al.

217.    On April 10, 2012, Sarah Hull emailed Rex Martin, Syngenta's representative to the U.S. Grains Council, stating: "We need to get some indication to growers or [NCGA] that China Viptera approval is done and is only waiting for the administrative signatures . . . David [Morgan] and Chuck [Lee] said growers are starting to return seed and we need to try to stop this." See April 10, 2012 email from Sarah Hull to Rex Martin (emphasis added).

218.    About a week later, during Syngenta's first quarter 2012 earnings conference call on April 18, 2012, Syngenta's Chief Executive Officer, Michael Mack, publicly stated that he

expected China to approve Agrisure Viptera® "quite frankly with in the matter of a couple of days." See http://www.morningstar.com/earnings/37715637-syngenta-ag-adrsyt-q1-2012-earnings- call-transcript.aspx. This, of course, was a year after Syngenta had already sold large quantities of Agrisure Viptera® to farmers across the country.

219.    On information and belief, however, Syngenta did not as of April 2012 have a reasonable basis for a belief that China's approval was "done," or its representation that approval was imminent. Syngenta certainly did not have any sort of official approval at this juncture.

220.    Indeed, on May 15, 2012, Syngenta received a rejection and deficiency letter from China's Ministry of Agriculture.

221.    Syngenta also distributed misleading written materials indicating that Agrisure Viptera® could be exported to China.

222.    For example, Syngenta distributed a "Request Form for Bio-Safety Certificates Issued by the Chinese Ministry of Agriculture" for Agrisure Viptera®. In China, "Bio-Safety Authorizations" are required for the issuance of shipment-specific "Bio-Safety Certificates." However, applying for shipment-specific Bio-Safety Certificates was (and is) pointless because MIR162 had not been approved for importation in China.

223.    Syngenta knew its Request for Bio-Safety Certificates Forms was pointless, but distributed it anyway in an effort to mislead U.S. farmers.

224.    Syngenta also distributed a "Plant with Confidence Fact Sheet," which contained deceptive statements regarding the importance of China as an export market:

> The vast majority of corn produced in the U.S. is used domestically. There is a misconception that China imports more grain than it actually does from the U.S. China has imported, on average, a little more than half of one percent – 0.5% – of all U.S. corn produced in the past five years. . . .

> Since very few U.S. grain outlets actually export to China, most have no reason to

restrict your right to plant the latest technologies.

*See* http://www.syngenta-us.com/viptera_exports/images/Agrisure-Viptera-Fact-Sheet.pdf

(emphasis removed).

225.    But contrary to the Plant with Confidence Fact Sheet, the NGFA reports:

> The U.S. Department of Agriculture (USDA) forecasts that China will become the world's largest corn importer by 2020. China is projected to increase its corn imports to 22 million metric tons (866 million bushels) by 2023, up from 2.7 million metric tons (106 million bushels) in 2012. For 2013, USDA had projected that the United States would export 37 million metric tons (1.457 million bushels) of corn, and that China would import an estimated 7 million metric tons (276 million bushels) – virtually all of it from the United States.

*See* http://www.ngfa.org/wp-content/uploads/NGFA-Flyer-for-Farmer-Customers-on-Potential-

Market-Impacts-of-Commercializing-Biotech-Enhanced-Seeds-Not-Approved-for-Import-into-

U.S.-Export-Markets.pdf.

226.    In other words, for 2013, the USDA estimated that China represented nearly 20%

of the U.S. export market.

227.    Prior to China's discovery in November 2013 of MIR162 in U.S. corn shipments,

China was the third largest market for U.S. corn—and was projected to grow substantially. China

was (and is) by far the largest potential growth market for U.S. corn.

**SYNGENTA CONTINUED TO EXPAND SALES OF AGRISURE VIPTERA® ACREAGE DESPITE NO APPROVAL FROM CHINA AND WHILE THE IMPORTANCE OF THE CHINESE MARKET CONTINUED TO INCREASE**

228.    China continued to be a major and growing market for U.S. corn and corn

products during the 2012 and 2013 crop years.

229.    But China still had not yet approved the import of MIR162. Syngenta was still in

the approval process, correcting deficiencies identified by the Ministry of Agriculture. It had no

assurance that approval would be conferred by the 2013 crop year. In fact, as of October 2013,

Syngenta was still completing required research supporting its application.

230.    At the same time, corn industry groups continued to object to Syngenta Seeds'
premature commercialization of Agrisure Viptera®.

231.    By 2013, China had become the third largest export market for U.S. corn. As
reported by the Iowa Corn Growers Association, "[i]n 2012/13, China was the third largest
export market for U.S. corn and up until the recent issue [the rejections beginning in November
2013] [China] was on track to meet or exceed that position." China and MIR162, 2- 2014, Iowa
Corn Growers Association (Feb. 6, 2014).

232.    Nevertheless, Syngenta continued to market Agrisure Viptera® during the 2012
and 2013 crop years. Estimates were that during this period, Syngenta had increased the market
share of its Agrisure Viptera® corn to well more than 2%, and, by some estimates as high as
3.5%, of the corn area grown in the U.S. See Christensen, Viptera Could Have Been Approved
for Importation into China, But Was Not, Seed in Context Blog (April 13, 2014)
(http://www.intlcorn.com/seedsiteblog/?p=1891).

233.    This increase further assured that Agrisure Viptera® would be disseminated
throughout the U.S. corn supply, and it could not – and would not – be channeled away from
export markets, such as China, which had not approved MIR162.

REGULATION, TESTING, AND DEREGULATION OF EVENT 5307

234.    On April 22, 2011, just months after Syngenta Seeds had released Agrisure
Viptera® for the 2011 crop year, Syngenta Biotech filed with APHIS a petition seeking the
deregulation of another insect resistant, genetically modified trait known as Event 5307. Event
5307 was ultimately deregulated by APHIS on January 29, 2013.

235.    Between 2005 and 2011, Syngenta Biotech conducted at least 101 field trials of

Event 5307 corn under at least 22 notifications made to APHIS under the GMO Regulations at sites in 23 states.

236.    Upon information and belief, at least some of the field trials of Event 5307 included tests of corn stacked with multiple traits, including both Event 5307 and MIR162. Further, upon information and belief, field tests conducted under the GMO Regulations of Event 5307, either singly or together with other traits, including MIR162, continued after Syngenta filed the Event 5307 Deregulation Petition and the January 29, 2013 deregulation of Event 5307.

237.    In its Event 5307 Deregulation Petition, Syngenta Biotech disclosed that upon deregulation of Event 5307, Syngenta Seeds did not intend to market Event 5307 as a stand-alone product, but intended to combine it with other traits, including MIR162. Syngenta also stated that (i) it intended to seek approval of products containing Event 5307 in countries which had functioning regulatory systems, and (ii) "Syngenta is also pursuing regulatory approvals for importation of corn commodities and processed goods containing Event 5307 corn in key export markets for U.S. and Canadian corn" and (iii) applications were currently planned for a number of additional countries, including China.

238.    In the discussion of "Adverse Consequences of Introduction," Syngenta Biotech stated that an upcoming Environmental Report would discuss a range of issues related to the deregulation of Event 5307 corn, "including any potential direct, indirect or cumulative impacts on . . . the economy, either within or outside the U.S."  Petition for Determination of Nonregulated Status for Rootworm-Resistant Event 5307 Corn (April 22, 2011) at 156 (http://www.aphis.usda.gov/biotechnology/petitions_table_pending.shtml).

239.    Following approval of Event 5307, Syngenta Seeds announced it would commercialize its Agrisure Duracade™ for the 2014 crop year, which contained both Event 5307

and MIR162, despite its continued failure to obtain approval from China for MIR162 and the fact

that Event 5307 also had not been approved.

### COMMERCIALIZATION OF AGRISURE DURACADE™ DESPITE MIR162'S CONTINUED DISRUPTION OF THE U.S. CORN TRADE

240. In November 2013, China began rejecting shipments of U.S. corn that tested

positive for the presence of MIR162. Syngenta, nevertheless, continued its false statements and

misrepresentations, as alleged herein, including through its decision to market Agrisure

Duracade ™ for the 2014 crop year.

241. The National Grain and Feed Association has detailed the disastrous results of

China's rejection of U.S. corn based upon the presence of MIR162:

> This development resulted in a series of trade disruptions – including testing; delays in vessel discharge; and deferrals, diversion and rejections of cargoes – when MIR162 subsequently was detected in U.S. shipments of corn and distillers dried grains with solubles (DDGS). These disruptions effectively shut U.S. corn farmers out of China's feed grain import market, which previously almost exclusively had been supplied by the United States. China subsequently has taken actions to utilize domestic, as well as international alternatives to U.S. corn. For instance, China's imports of U.S. grain sorghum have increased significantly. China also has sourced corn from Ukraine. And most recently, Brazil and Argentina each were granted approval to begin exporting corn to China. . . .

> This disruption, tied to positive detections of MIR 162 that began in November 2013, has virtually halted U.S. corn trade with China. . . .

> USDA currently is projecting Chinese corn imports will reach 22 mmt [million metric tons] by 2023, which if realized would account for nearly half of the projected growth in total world corn trade. However, if the MIR 162-related trade disruption continues, other corn exporting nations, such as Ukraine, are capable of replacing the United States as the principal corn exporter to China. . . .

> [T]he MIR 162-induced trade disruption has resulted in market price loss on unfulfilled export sales, price loss on diverted sales because of the compromised economic negotiating position of U.S. exporters, demurrage costs, and lower market prices for U.S. commodities and products. The total loss for these sectors of the U.S. grain industry is estimated to range from $1 billion to $2.9 billion.

*See* http://ngfa.org/wp-content/uploads/Agrisure-Viptera-MIR-162-Case-Study-An-Economic-

Impact-Analysis.pdf (emphasis added).

242. Syngenta nevertheless moved forward with commercialization of Agrisure

Duracade™ for the 2014 planting season.

243. On January 23, 2014, the National Grain and Feed Association and the National

American Export Grain Association issued another Joint Statement imploring Syngenta to stop

its heedless and irresponsible commercialization:

> On Jan. 22, 2014, the National Grain and Feed Association (NGFA) and North American Export Grain Association (NAEGA) sent a letter to Syngenta asking the company to immediately halt commercialization in the United States of its Agrisure Viptera® corn and Agrisure Duracade™ corn until such time as China and certain other U.S. export markets have granted required regulatory approvals/authorizations.
>
> The NGFA and NAEGA . . . are gravely concerned about the serious economic harm to exporters, grain handlers and, ultimately, agricultural producers – as well as the United States' reputation to meet its customers' needs – that has resulted from Syngenta's current approach to stewardship of Viptera. Further, the same concerns now transcend to Syngenta's intended product launch plans for Duracade, which risk repeating and extending the damage. Immediate action is required by Syngenta to halt such damage.
>
> There are numerous negative consequences incurred when the Chinese and other U.S. export markets are put at risk through commercialization of biotechnology-enhanced seeds before approvals for import into foreign markets are obtained. Such consequences may include reducing the value and demand for the U.S. farmers' products, preventing foreign consumer access to much-needed supplies, shutting off or increasing the cost of U.S. producers' access to some export markets for their crops, exposing exporting companies to financial losses because of cargo rejections and contract cancellations, and ultimately diminishing the United States' reputation as a reliable, often-preferred supplier of grains, oilseeds and grain products in world markets. Commercialization prior to foreign regulatory approvals also has a negative impact on the overall U.S. corn and other grain value chains, and reduces significantly U.S. agriculture's contribution to global food security and economic growth.
>
> Within the U.S. grain and oilseed handling and marketing system, each purchaser or handler makes its own determination as to whether to accept various commodity crops – including those produced from biotechnology-enhanced seeds. Such a decision likely is driven by customer preferences, infrastructure and operational limitations, regulatory regimes and contractual commitments, as well as meeting regulatory requirements in the respective markets they serve. Given

the nature of the U.S. grain marketing system, these business decisions extend to the first point of sale or transfer from the producer.

As a matter of policy, NGFA and NAEGA have communicated consistently, clearly and in good faith with biotechnology providers and seed companies about the importance of biotechnology providers actually obtaining regulatory approvals/authorizations for import in foreign markets before such traits are commercialized in the United States. Individual grain handler, processor, service provider and exporter member companies of our Associations represent further system-wide support and advocacy for this policy.

U.S. farmers, as well as the commercial grain handling and export industry, depend heavily upon the exercise of due corporate responsibility by biotechnology providers with respect to the timing of product launch and commercialization. We therefore seek assurances from Syngenta that it will follow suit by publicly announcing that it will suspend immediately its commercialization of Viptera and Duracade products in the United States until such time as China and other U.S. export markets have granted required regulatory approvals and authorizations.

*See* http://www.ngfa.org/wp-content/uploads/NAEGA-NGFA-Joint-Public-Statement-on-Syngenta- Agrisure-Viptera-and-Duracade-Biotech-Traits-Jan-23-2014.pdf.

**244.** Syngenta spokesman, Paul Minehart, responded by stating: "Changing our marketing plan in the U.S. now would have no effect on grain in the system or Chinese acceptance of corn imports." U.S. Groups Urge Syngenta to Hold Back on GMO Corn Barred by China, Reuters (Jan. 23, 2014) (emphasis added).

**245.** This pronouncement recognizes that indeed, MIR162 has contaminated the U.S. corn supply to an extent that it cannot be undone. This is even more true given that Syngenta continues to market and sell Agrisure Duracade™ in addition to Agrisure Viptera®.

**246.** In March 2014, in meetings with the NGFA, Syngenta advised that its introductory launch of Agrisure Duracade™ would likely extend to between 250,000 and 300,000 acres in a launch zone that included portions of each of the ten (10) states that grow the largest amounts of corn. In the same meetings, Syngenta refused to accept responsibility or liability if and when Agrisure Duracade™ becomes present in countries that had not approved it.

NGFA, Latest News, Syngenta Provides Additional Details on Plans for Introductory Launch of Duracade Biotech Corn in 2014 (March 7, 2014) (http://www.ngfa.org/2014/2014/03/07/ Syngenta-provides-additional-details-on-plans-for-introductory-launch-of-duracade-biotech-corn-in-2014/).

247.    In launching Duracade™, Syngenta stated that growers would be required to sign a stewardship agreement requiring the grower to either feed the corn to livestock or poultry on the farm, or deliver it to a grain handling facility, feed mill, feed lot, or ethanol plant—but not export the corn or corn co-products to China or the European Union. See National Grain and Feed Association Newsletter, Vol. 66, No. 5 (March 7, 2014) at 2.

248.    The version of the Duracade™ stewardship agreement at launch, however, did not do so. See Syngenta Seeds Stewardship Agreement (Rev. June 5, 2013).

249.    Syngenta also did not require planting or harvesting protocols, but only made "recommendations" that producers (i) select fields for planting Duracade™ surrounded by the producer's own corn fields or planted next to a non-corn field; (ii) place signs to notify others that Duracade™ was planted in the field; (iii) plant buffer rows; (iv) clean planters; (v) properly dispose of unused seed and return unopened seed units to the seed provider; (vi) separately harvest Duracade™; (vii) flush the combine; (viii) deliver corn containing Duracade™ to a previously arranged delivery point; (ix) store Duracade™ in a separate bin on the grower's farm; and (x) clean bin floors.

250.    Syngenta officials stated that while Syngenta would apprise growers of such "recommendations," it "declined to incorporate the recommendations into the stewardship agreement because they did not want to dictate such practices to producers." National Grain and Feed Association Newsletter, Vol. 66, No. 5 (March 7, 2014) at 2.

251.    Syngenta was and is well aware that such measures are minimally necessary to an adequate stewardship program. Yet Syngenta did not require such measures in connection with marketing and selling both Agrisure Viptera® and Agrisure Duracade™.

252.    The NGFA issued a dire forecast of the damage Agrisure Duracade™'s premature commercialization will cause:

> For the 2014 planting season, Syngenta has introduced another trait called Agrisure Duracade™ 5307 (hereafter referred to as 5307) that currently lacks Chinese import approval, potentially prolonging the U.S. loss of the large, growing Chinese feed grain import market. . . .
>
> China is roughly one year into its semi-regular, two-year process of evaluating the authorization of 5307 for import in food, feed and for further processing. Since Chinese authorization of 5307 is not expected for at least another year, China is expected to continue enforcing a zero-tolerance policy for unapproved biotech-enhanced traits in 2014/15, as occurred in marketing year 2013/14 for MIR162. Thus, the commercialization in the United States of 5307 is expected to prolong the economic impact on U.S. corn and other commodities that began in mid-November 2013.
>
> Similarly to 2013/14, when the United States lost access to the Chinese corn import market, the 2014/15 market price impact caused by the presence of 5307 in U.S. commodity exports is expected to extend beyond the corn market and potentially affect other commodities, such as DDGS, soybean meal and soybeans, because of the substitutability of corn for these commodities in domestic feed rations. . . .
>
> [A]fter accounting for projected benefits and costs, the net economic impact of the 5307 commercial launch is estimated to result in a loss to the U.S. grain value chain ranging from $1.2 billion to $3.4 billion, with a mid-point estimated net economic loss of $2.3 billion.

See http://www.ngfa.org/wp-content/uploads/Agrisure-Duracade-5307-Economic-Impact-Analysis.pdf (emphasis in original).

253.    In March 2014, Syngenta pulled Agrisure Duracade™ from the Canadian market for the 2014 growing season because China and the European Union had not yet approved MIR162.

254.    Syngenta said in a notice to Canadian growers: "While the vast majority of the

64

Canadian corn crop is typically directed to domestic markets in North America, some corn may

be destined for these markets." Reuters, Syngenta halts sales of new GMO corn seed in Canada

(Mar 10, 2014). "Accordingly, we want to ensure the acceptance of any trait technology grown

in Canada meets end-market destination requirements." Id.

255.    As illustrated by the statements of its own representatives and this action,

Syngenta knew China was (and is) a key corn importer, and responsible management requires

that its approval be obtained before commercialization of a bio-engineered corn trait.

256.    As further illustrated, Syngenta knows how to withdraw an unapproved GMO

trait from the market when it wants to do so. Nevertheless, Syngenta continued, and continues, to

market and sell MIR162 corn in the U.S.

257.    Compounding its irresponsibility, Syngenta then decided to commercialize

Agrisure Duracade™ in 2014, even though it contains MIR162, and also contains another

genetic trait, Event 5307, not approved by China or other major purchasers of U.S. corn.

258.    In September 2014, Syngenta announced 52 new corn hybrids for the 2015

growing season. MIR162 was in 23 new Agrisure Viptera® products and 18 new Agrisure

Duracade™ products. See Syngenta Announces 52 New Corn Hybrids for 2015 Season (Sept.

17, 2014) (http://www.agprofessional.com/news/Syngenta-announces-52-new-corn-hybrids-for-

2015¬season-275494841.html).

259.    In December 2014, China finally approved MIR162 for importation into China.

By then, however, Syngenta already had begun commercializing yet another GMO corn seed

product as discussed above. In addition, China's December 2014 approval is not likely to lessen

the impact of Syngenta's conduct anytime soon.

260.    Syngenta affirmatively and purposefully engaged in all the actions and inactions

described above in order to increase its own profits, ignoring the tremendous risks its profit-driven strategy imposed upon U.S. corn farmers and others.

261.    Syngenta knew, or should have known, prior to its commercialization of Agrisure Viptera® and at all times since then, of the high likelihood that Agrisure Viptera® would contaminate the U.S. corn supply and channeling in the circumstance of its clearly inadequate "stewardship" program would not work. As such, it was inevitable that Viptera® corn would move into export channels, including China, and cause trade disruption—as Syngenta well knew.

262.    Syngenta's wrongful acts and omissions have resulted in the pervasive contamination of the U.S. corn supply, including fields, grain elevators, and other storage and transport facilities, causing physical harm to Plaintiffs' corn, harvested corn, equipment, storage facilities, and land.

263.    The likelihood that Agrisure Viptera® and Agrisure Duracade™ would (and will continue to) contaminate the U.S. corn supply was readily foreseeable to, and indeed, foreseen by Syngenta, as was the harm to U.S. corn producers who Syngenta describes as among its stakeholders "affected by" Syngenta's business.

264.    Syngenta had the right and ability to control the timing, size, and geographic scope of its commercialization of Agrisure Viptera® and Agrisure Duracade™, as well as the extent to which adequate containment measures would be required of its customers. Syngenta also could have instituted channeling measures but failed to do so. Syngenta also ignored repeated warnings from stakeholders, misrepresenting and concealing material information—all to further its own profit.

265.    Syngenta did not simply fail to take precautions against foreseen and at minimum, clearly foreseeable harm, but acted affirmatively to create the harm.

**266.** Syngenta's above-described wrongful actions and inaction directly caused, and contributed to cause, significant economic harm to farmers and other participants in the corn industry as further explained below.

**ECONOMIC IMPACT**

**267.** The characteristics of the world corn market have important implications for understanding the market price impact of the Chinese ban on U.S. corn and corn products containing MIR162. Those include:

    a.  Corn is the most widely used feed grain in the world.

    b.  The United States is by far the largest producer and exporter of corn.

    c.  Prior to the import ban, virtually all of China's corn imports were from the United States.

    d.  Prior to the import ban, China was the third largest market for U.S. corn exports.

    e.  The latest USDA agricultural trade projection is that China will be the world's largest importer of corn by 2020.

    f.  The MIR162 import ban virtually halted U.S. corn sales to China indefinitely.

    g.  The world price of corn is established in Chicago, and the loss of a key market for the U.S. puts downward pressure on the world price that, in turn, reverberates to farm gate prices throughout the U.S.

    h.  Corn is a commodity and a relatively small change in the global volume of trade in a commodity market like corn will have a magnified price impact.

    i.  An exporter's reputational loss in an agricultural commodity market due to a significant event—such as a GMO contamination—can persist for many years. Once an exporter has lost a foreign market, it is difficult to get it back.

**THE GLOBAL CORN MARKET**

**268.** World corn production totaled 983.3 million metric tons (mmt) in 2013/14 (about 38.7 billion bushels). This supply was concentrated in a relatively small number of countries. The world's largest corn producers are the U.S. (36% of global production in 2013/14), China

(22%), Brazil (8%), and the EU (7%).

269.    Global usage of corn has expanded by about 37% in the last decade due to rising population and incomes and increased urbanization with its associated changing dietary patterns. Feed usage accounts for about 58% of total global corn use, industrial use 27%, and food 11%. The pie chart below shows corn consumption by region.

**World Corn Consumption by Region**



Source:  International Grains Council

270.    At the end of each crop year, corn inventories are carried forward in case of a short harvest. The United States and China are the largest holders of corn inventories. At the end of 2013/14, these two countries held 70% of the 176 mmt of global corn stocks.

271.    Total world corn trade is about 100 to 120 mmt per year. Prior to the MIR162 ban, China was importing about 4% of global corn sales. That amount is projected by the USDA to increase substantially to 16 million metric tons by 2020 when China is forecasted to be the world's largest corn importer. See chart below.

**China expected to become largest global corn importer**



Source: USDA Productions, Supply and Distribution database and projections.

   **272.**    The U.S. is the dominant corn exporting country (36% of global corn exports).

The next largest corn exporters are Brazil (20%), Ukraine (17%), and Argentina (10%). These

four countries collectively account for over 83% of global corn exports.

**Table: Major Corn Exporters: July 2013/ June 2014**

| Exporting Country | U.S. | Brazil | Ukraine | Argentina | Others | Total |
|---|---|---|---|---|---|---|
| Exports (million metric tons) | 42.8 | 23.5 | 19.9 | 12.0 | 21.8 | 120.0 |
| Exports (million bushels) | 1,685 | 925 | 783 | 472 | 858 | 4,724 |

Source: International Grains Council

**273.** Just over 10 years ago, China was a significant corn exporter (and other grains), with exports peaking at 15.2 million metric tons in 2002/03. China flipped from being a corn exporter to a corn importer in 2009/2010.



**274.** As the chart below shows, China turned from a net grain exporter to a net grain importer in 2008. Imports of grains (including corn) surged during the 2012-13 time period, reaching 18 mmt. Most of this grain originated from the U.S.



China's net imports of grains surged during 2012-13

Million metric tons

Note: Net imports = imports – exports. Data for calendar years.
*DDGS= Distillers Dried Grains With Solubles.
Source: USDA, Economic Research Service analysis of China customs statistics.

275.    The import side of the international trade equation is more diverse with the major importers including the EU, Japan, Mexico, South Korea, Chinese Taipei, China, and Turkey (together accounting for 55% of imports in 2013/14). This leaves 45% of the corn imports destined for a large number of small importers.

**Major Corn Importers**



Source: International Grains Council.

276.    In its annual long-term grain trade projections, released in February 2014, the

USDA projected China's corn imports would grow from 2.7 mmt in 2012/13 to 22 mmt in 2023/24. China is by far the largest potential growth market for U.S. corn. These projections place China as the largest corn importer in the world by 2020.

### U.S. CORN MARKET

277.    Corn is the largest crop produced in the U.S., measured either by value of production or planted acres. In the 2013/14 September-August fiscal year, U.S. corn growers produced about 13.9 billion bushels of corn, worth more than $60 billion. Corn is used for livestock (primarily cattle, hogs, and chickens) feed (37% of 2013/14 crop), food, alcohol and industrial usage (46% of the 2013/14 crop), and exports (14% of the 2013/14 crop). USDA, Economic Research Service, Feedgrains Yearbook, Table 4. See http://www.ers.usda.gov/data-products/feed-grains-database.aspx#.VEJk-SiwRzo.

278.    U.S. corn production is concentrated in the neighboring Midwestern states comprising the "corn belt," where soil and climatic conditions are highly conducive to growing corn.1 About 95.4 million acres were planted in corn in the U.S. during the September-August 2013/14 marketing year.

279.    Corn prices throughout the United States are tied to the Chicago Board of Trade (CBOT) futures price through the "basis" (defined as the futures price minus the local cash price). The U.S. corn market is spatially integrated and informationally efficient. Basis levels for spatially separated markets are also closely linked. Events such as trade disruptions that affect the CBOT corn prices directly affect the prices U.S. corn farmers receive for their corn.

---

[1]    Although there are different opinions regarding precisely which states compose the "corn belt," the top ten corn producing states are Iowa, Illinois, Nebraska, Minnesota, Indiana, South Dakota, Wisconsin, Kansas, Ohio and Missouri.

### CHINA CORN MARKET

**280.** China is a large player in the global market for agricultural products. As of 2012, it was the fourth largest exporter and second largest importer of agricultural products in the world according to World Trade Organization trade statistics. Its import growth has been driven by a shift in its domestic production mix, and changing consumer diets with rising incomes and urbanization. The changing diets have especially driven strong demand growth for meat (mainly pork and chicken), which requires a large supply of feed grains, including corn, distillers' dried grains with solubles (DDGS), a byproduct of corn ethanol production, and soybeans.

**281.** China is the now largest foreign market for U.S. agricultural products. The USDA (Outlook for U.S. Agricultural Trade, AES-83 (August 28, 2014)) reports that U.S. agricultural exports to China have almost doubled in the last five years, totaling $28 billion in fiscal Oct. 2013-Sept. 2014.

**282.** Prior to the U.S. corn import ban, the top three U.S. agricultural exports to China (in order of importance) based on value of trade were soybeans, cotton, and corn. In November 2013, China started turning back cargoes containing Syngenta's MIR162 biotech corn. While MIR162 is now approved, Event 5307 still is not.

**283.** U.S. corn exports to China reached 5.146 mmt in 2011/12 (approximately 13% of U.S. exports that Sep-Aug marketing year) and were 2.39 mmt in 2012/13–still about 13% of exports (lower export volume due to the big U.S. drought). By contrast, due to the China import ban of U.S. corn, beginning in November 2013, the absolute volume of U.S. corn exports to China in 2013/14 was not much higher than the drought year, and fell to less than 6% of exports. If the current trend that began after November 2013 continues, U.S. corn exports to China in 2014/15 and beyond will be negligible. The following graph shows the dramatic difference in accumulated U.S. corn exports to China after the MIR162 ban, taking into account seasonal

variations in export quantities.



5/15/2015 Source: USDA/FAS/Export Sales Reporting

**284.** If access to the China market continues to be denied to U.S. corn imports, the

losses will be even more significant and will continue to grow. As the following quote explains,

China was expected to be a very rapidly growing import market for corn.

> China's corn imports are projected to rise steadily and reach 22 million tons by
> 2023/24. China's strengthening domestic demand for corn is driven by structural
> change and growth in its livestock sectors, as well as by rising industrial use. The
> increase in China's imports accounts for nearly half of the projected growth in
> world corn trade.

USDA Long-Term Projections (Feb. 2014) at 20; USDA Agricultural Projections to 2023,

www.usda.gov/oce/commodity/projections/.

**285.** For fiscal year 2013/2014 China was expected to import 7 mmt of corn; in

2014/15, 6 mmt of corn. After the news of the rejected corn shipments surfaced, USDA analysts

lowered projections of China's total annual imports from 7 to 3.5 mmt in 2013/14, and from 6 to

3 mmt for 2014/15. These projections obviously reflect the assumption that U.S. corn trade with

China will begin again sometime in 2014/15. If that does not occur, the actual imports will be far lower than the projected imports. The damage to the U.S. corn market and the prices U.S. corn farmers receive for their corn likely will be long lasting.

286.    To make up for reduced U.S. corn imports, China has increased imports from the Ukraine, Brazil, and Argentina. The U.S. is already beginning to lose China as an important corn export market. If the import ban continues, it will be increasingly difficult to get it back.

### GMOs in China

287.    China imports more biotech soybeans than any other country. This marketing year, China is expected to import 72 mmt of soybeans. The vast majority of China's soybean imports are biotech varieties, even though biotech soybeans (and corn) are not commercially grown in China. China imports soybeans primarily from the U.S., Brazil and Argentina.

288.    China has approved five-biotech crops for importation – canola, cotton, corn, soybeans, and sugar beets. Approximately fifteen different corn biotech products have been approved by China, including "events" developed by Monsanto, Syngenta, Bayer, and Du Pont. There are eight approved soybean products, six cotton products, seven canola products, and one sugar beet product.

289.    China started testing and rejecting cargoes of U.S. corn in November 2013, and subsequently began rejecting U.S. DDGS imports in June or July 2014.

290.    By mid-December 2013, China had rejected shipments of U.S. corn totaling 545,000 metric tons. See http://www.reuters.com/article/2013/12/20/china-corn-idUSL3N0JZ0EZ20131220. China also rejected 2,000 metric tons of U.S. DDGS in December 2013, and continued rejecting DDGS through 2014. See http://ngfa.org/wp-content/uploads/Agrisure-Viptera-MIR- 162-Case-Study-An-Economic-Impact-Analysis.pdf.

291.    Beginning in July 2014, China's General Administration of Quality Supervision,

Inspection and Quarantine announced that it would require official government certification from the point of origin that DDGS shipments are free of MIR162. DDGS are used in livestock feed rations primarily as an energy source. China's rejection of U.S. DDGS due to the presence of MIR162 has (and continues to have) important – and negative – implications on U.S. corn prices.

**DDGS TRADE**

**292.**     U.S. DDGS exports to China totaled 2.16 mmt in calendar year 2012 and 4.45 mmt in calendar year 2013. DDGS trade has been hit hard recently, but the extent of the impact on corn prices may not show up in the trade data yet.

**U.S. Exports of Corn and DDGS to China: 2009-2013 (calendar years)**



Source: USDA, GATS. DDG HS code 2303300000

**293.**     China was by far the largest market for U.S. DDGS exports, accounting for approximately 50% of all exports. The U.S. exports over 20% of annual DDGS production. See http://www.extension.iastate.edu/agdm/crops/outlook/dgsbalancesheet.pdf.

**294.**     The loss of the large Chinese market for DDGS displaces corn in the U.S. domestic market, pushing corn prices down further.

**295.**     DDGS are an important source of revenue for U.S. ethanol plants. Lower DDGS

prices due to the loss of the Chinese corn market have negatively affected ethanol crush margins. The corn crush spread is a dollar value quoted as the difference between the combined sales values of the products (ethanol and DDGS) and the cost of corn. China's ban has lowered DDGS prices and, therefore, lowered the DDGS value per bushel of corn processed by the ethanol producers. This may be partially offset by a lower price of corn due to the ban. However, USDA figures on ethanol crush margins indicate the difference between corn price and value of co-products was $3.67 per bushel on May 2, 2014, which fell to $2.28 per bushel on September 26, 2014. Values have continued to fall. About 4.7 billion bushels of corn are used for ethanol annually, so the financial loss to the ethanol industry from the MIR162 ban is significant.

296.     The impact of the loss of the Chinese market for corn and corn products to U.S. corn farmers likely will be long lasting. The MIR162 incident has similarities to other international GMO contamination incidents, which have had long-lasting market effects. For instance, eight years after the 2006 Bayer Crop Science's Liberty Link contamination of the U.S. long-grain rice supply, exports to Europe have yet to recover. Prior to the 2006 marketing year the EU-27 procured approximately 25% of its rice imports from the United States. Immediately after the contamination event, the EU blocked imports of any new commercial U.S. long-grain rice imports. U.S. long grain rice farmers lost one of their most important markets, and have yet to get it back despite considerable effort and expense. Recently, an official delegation from the U.S. rice industry visited countries in the EU (including Germany and the United Kingdom) where they held discussions focused on the re-introduction of U.S. rice into the EU market. After this visit, the USA Rice Federation reported that market re-entry faces significant hurdles:

> The U.S. has a superior product and the industry has successfully addressed environmental and social concerns of this market, but it's clear we have more work to do before our German customers return to us," said Keith Glover, president and CEO of Producers Rice Mill and chairman of USA Rice's World Market Price

committee.

*See* USA Rice Federation, *USA Rice Daily* (October 14, 2014). The same will happen here.

297.    In commodity markets like corn, a relatively small change in trade volume can have a significant impact on price. One of the prime examples of the operation of this basic law of economics occurred in 1973 when Middle Eastern Arab oil producers (OPEC) cut off oil exports to the U.S. to protest American military support for Israel. Even though oil imports from this region accounted for only about 10% of the U.S. oil supply, petroleum prices quadrupled in response to the export embargo, causing long lines for gasoline at filling stations.

298.    Another more recent example of inelastic demand at work is evident from the world coffee market. Brazil produces about 35% of the world's coffee and is unfortunately in the middle of a drought that is affecting both the 2014 and 2015 coffee harvests. In 2014 the Brazilian coffee harvest was down about 13%, which doubled the price of coffee. World coffee production is about 150 million bags per year and as the following quote from the Financial Times indicates, a 10 million bag swing in Brazil's production over a two year period (about a 3.5% change in production) can cause coffee prices to range from $1.50 to $3.00 per pound:

> Brazil is the largest coffee producer in the world, accounting for about 35 per cent of all output. Industry consensus around the 2014 Brazilian harvest seems to have settled at about 48m 60kg bags, down from the previous year's 54-55m, but the 2015 forecasts have ranged widely between 40m and 53m bags. Estimates for the cumulative Brazil supply 2014 and 2015 combined, range from 92m to 102m bags, which is the difference between $3.00 and $1.50 per pound of coffee.

FINANCIAL TIMES (Sept. 17, 2014).

299.    Based on the same economic logic, the Wall Street Journal reasoned that the loss of the Chinese corn market to the U.S. industry over MIR162 will have an important impact on future U.S. corn prices even though the Chinese market is only about 12% of U.S. corn exports.

> Exports account for only about 12% of the U.S. corn crop, but China's rapid growth gives the country an outsize influence over prices.

*U.S. Corn Exports to China Dry Up Over GMO Concerns*, WALL STREET JOURNAL (April 11, 2014).

300.    In the U.S. corn market, both domestic demand and supply curves are relatively inelastic, especially in the short run. Elasticity measures the degree of responsiveness in supply or demand to price changes. If both the supply and demand curves are inelastic, then for each curve it will take a relatively large change in price to effect a change in quantity demanded or supplied. This is shown in the left panel of the diagram below where the U.S. domestic demand for corn is represented as schedule USD and the domestic supply is labeled as USS. Both of these curves are inelastic as drawn. The horizontal difference between the supply (USS) and demand (USD) at world price (PUS) is the amount of corn exported.

301.    The right hand panel of the diagram shows the market for U.S. corn exports. The U.S. export supply curve shown to the world market is labeled as USES. This curve is based on the U.S. domestic supply and demand curves in the left hand panel. For any price above the point where USD and USS intersect in the left hand panel, there is excess domestic corn supplied to the world market according to the schedule USES in the right hand panel. The world demand for U.S. corn is shown by the curve ROWED in the right hand panel. This includes demand from China. Following the MIR162 ban, the ROWED curve shifts left as shown by the arrows in the right hand panel. An inward shift of the global demand for U.S. corn reduces exports from the U.S. The intersection of the shrunken ROWED curve and USS determines the volume of trade after the MIR162 ban. U.S. corn exports are reduced by a fixed volume due to a foreign market closing, and the U.S. price falls to P'US. The drop in price is relatively large even if the shrinkage in exports is a small share of production because the price must fall to clear a market in which both supply and demand are inelastic.



302.    Under the bedrock economic law of supply and demand for an exportable good, when there is less foreign demand for a product, particularly one with relatively inelastic demand and supply curves, the price is lower than it otherwise would be.

303.    As a result, all U.S. corn farmers who priced their corn after November 2013 have received (and continue to receive) a lower price for their corn than they would have received if China's U.S. corn imports had not effectively stopped due as a direct and proximate result of Syngenta's above-described wrongful actions and inaction.

**CLAIMS FOR RELIEF/CAUSES OF ACTION**

**COUNT I**

**VIOLATION OF THE LANHAM ACT**
**(15 U.S.C. § 1125(a))**
**(For All Plaintiffs)**

304.    The preceding factual statements and allegations are incorporated by reference.

305.    The Lanham Act, 15 U.S.C. § 1125(a), entitled "False designation of origin, false descriptions, and dilution forbidden," provides, in pertinent part:

a. Civil action

(1)    Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

    (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

    (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities;

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

**306.**    Syngenta used (and continues to use) in commerce false or misleading descriptions of fact, and/or false or misleading representations of fact, which misrepresented, and were likely to cause and/or did cause confusion and mistake or to deceive, regarding MIR162, the timing of its approval by China, its impact on export markets for U.S. corn, including China, the ability to channel MIR162 away from export markets which have not approved MIR162, and corn prices.

**307.**    Syngenta's representations, statements, and commentary have included, inter alia:

    a.    To APHIS and the public, including stakeholders interested in the MIR162 Deregulation Petition, that deregulation of MIR162 should not cause an adverse impact upon export markets for U.S. corn, Syngenta would communicate the stewardship requirements "using a wide ranging grower education program," and, at the time the MIR162 Deregulation Petition was submitted to APHIS, regulatory filings were in progress in China;

    b.    To APHIS and the public that MIR162 would be channeled away from markets which had not yet approved MIR162;

    c.    To the press and to investment analysts on quarterly conference calls;

    d.    Through statements in marketing materials published on the Internet, such as its "Plant with Confidence" fact sheet; and

e.    Through other statements indicating that approval from China for MIR162 corn was expected at times when Syngenta knew it was not.

Each, as more fully alleged above, are materially false statements that misrepresented, and are, and continue to be, likely to cause confusion and mistake as to the nature, characteristics, and qualities of MIR162 corn, the timing of its approval by China, the impact of MIR162 corn on export markets, including China, for U.S. corn, and the ability to channel MIR162 away from export markets that have not approved MIR162, and corn prices.

308.    Syngenta's misleading representations of fact relating to the U.S. corn export market, particularly in relation to China's position as a major export market, also misrepresented to, and deceived and/or continue to deceive, farmers and other consumers. Syngenta's "Plant with Confidence" fact sheet contains misrepresentations, false statements, and false commentary that have caused, and are likely to continue to cause, confusion and mistake as to the percentage of U.S. corn exported to China on an annual basis, among other facts.

309.    Syngenta's above-described misrepresentations, false statements, and false commentary include the statements in the MIR162 Deregulation Petition as more fully set forth above.

310.    Syngenta above-described misrepresentations, false statements, and false commentary also deceived and continue to deceive corn farmers, consumers, and stakeholders as to the approval of MIR162 corn for importation into China, a major U.S. corn export market.

311.    Syngenta's MIR162 corn products were misrepresented, and caused, and/or were likely to cause, customer confusion regarding the approval of the products from foreign regulatory authorities, including the Chinese government.

312.    Syngenta's above-described misrepresentations, false statements, and false

commentary were made in commercial advertising or promotion for MIR162 corn products, including Agrisure Viptera® and Agrisure Duracade™.

313.    Syngenta had (and continues to have) an economic motivation for making its above-described misrepresentations, false statements, and false commentary as Syngenta was incentivized to sell its MIR162 corn products.

314.    Syngenta's above-described misrepresentations, false statements, and false commentary were likely to influence purchasing decisions by domestic corn producers.

315.    Syngenta's above-described misrepresentations, false statements, and false commentary were widely distributed which, at the very least, is sufficient to constitute promotion within the grain industry. Syngenta's above-described misrepresentations, false statements, and false commentary, therefore, are and/or were material.

316.    Syngenta's products, including Agrisure Viptera® and Agrisure Duracade™ corn seed, travel and/or traveled in interstate commerce.

317.    Plaintiffs have been (and continue to be) damaged by Syngenta's above-described material misrepresentations, and false statements and commentary. Plaintiffs were injured and/or continue to suffer injury to, among other things, their property and possessory rights in the corn they have grown, as well as the negative market price impact explained above—all of which has resulted in lower revenues and profits. Such economic injuries are likely to continue in the future.

318.    Syngenta's above-described misrepresentations, false statements, and false commentary were made with knowledge or reckless disregard of their falsity, and the resulting risk and damage to Plaintiffs, other corn producers and stakeholders.

319.    Syngenta's above-described misrepresentations, false statements, and false

commentary, in fact, directly and/or proximately caused Plaintiffs to suffer damages.

320. Plaintiffs have been (and continue to be) damaged by Syngenta's above-described misrepresentations, false statements, and false commentary. Plaintiffs have suffered (and continue to suffer) injury to, among other things, their property and possessory rights in the corn they have grown, as well as the above-described negative market price impact, which has resulted in lower revenues and profits. Such economic injury is likely to continue into the future.

321. Syngenta's above-described misrepresentations, false statements, and false commentary constitute false descriptions and false representations in interstate commerce in violation of § 43(a) of the Lanham Act, thereby entitling Plaintiffs to recover, inter alia, damages, litigation expenses, and costs of suit and, since this case is exceptional, their attorneys' fees.

## COUNT II

### VIOLATION OF THE MINNESOTA UNFAIR TRADE PRACTICES ACT AND MINNESOTA CONSUMER FRAUD ACT
### (MINN. STAT. §§ 325D.13 and 325F.69)
### (For All Plaintiffs and/or the Minnesota Plaintiffs)

322. The preceding factual statements and allegations are incorporated by reference.

323. Syngenta made the above-described material misrepresentations, false statements, and false commentary regarding MIR162, and its impact on export markets for U.S. corn, including China, and corn prices.

324. Syngenta's above-described material misrepresentations, and false statements and commentary have been largely disseminated, and include:

a. To APHIS and the public, including stakeholders interested in the MIR162 Deregulation Petition, that deregulation of MIR162 should not cause an adverse impact upon export markets for U.S. corn, Syngenta would communicate the stewardship requirements "using a wide ranging grower education program," and, at the time the MIR162 Deregulation Petition was submitted to APHIS, regulatory filings were in progress in China;

b.    To APHIS and the public that MIR162 would be channeled away from markets which had not yet approved MIR162;

c.    To the press and to investment analysts on quarterly conference calls;

d.    Through statements in marketing materials published on the Internet, such as its "Plant with Confidence" fact sheet; and

e.    Through other statements indicating that approval from China for MIR162 corn was expected at times when Syngenta knew it was not.

325.    In addition, Syngenta stated in 2007 that its regulatory filings with China were "in process" when it did not actually file for approval from China until 2010.

326.    Syngenta made numerous misrepresentations pertaining to the status of China's import approval for MIR162. Among others, and as more fully set forth above, Syngenta during the summer of 2011, represented to stakeholders, including corn producers (to encourage further sales, planting and harvesting of MIR162), that it would receive China's MIR162 approval in March 2012. Syngenta continued making this misrepresentation throughout the planting and harvesting season in 2011 and into 2012. On April 18, 2012, Syngenta's Chief Executive Officer, Michael Mack, stated that he expected China to approve Agrisure Viptera® "quite frankly within the matter of a couple of days." Based upon Syngenta's knowledge of the Chinese regulatory process, and its own status within that process for MIR162, Syngenta knew this representation was false and/or made this representation recklessly and willfully without regard to its consequences.

327.    In addition to these material misrepresentations, false statements, and false commentary, Syngenta failed to disclose, and actively suppressed and concealed, the fact that (i) MIR 162 approval from China was not imminent or even reasonably likely to occur for (at least) the 2011 or 2012 growing seasons, and (ii) purchasing and planting Agrisure Viptera® created at least a substantial risk of loss of the Chinese corn market.

**328.** Syngenta also has at all relevant times made false and misleading statements regarding the ability to channel MIR162 corn, as well as the state and effectiveness of its supposed stewardship generally and in regard to MIR162.

**329.** Syngenta also failed to disclose, and actively suppressed and concealed, that there was not (and would not be) an effective system in place for isolating or channeling Agrisure Viptera® or Agrisure Duracade™.

**330.** As a developer of GMO products, including MIR162, Syngenta has special knowledge of regulatory matters and facts pertaining to the content and status of its application for foreign approvals to which corn farmers, including Plaintiffs, do not have access.

**331.** Syngenta also has special knowledge regarding the systems it instituted (and did not institute) for isolating and channeling its GMO products, including Agrisure Viptera® and Agrisure Duracade™, which was not available to corn farmers, including Plaintiffs.

**332.** Syngenta knew, but failed to disclose, suppressed, and concealed that systems were not in place for isolating or channeling of Agrisure Viptera® and Agrisure Duracade™, and that absent robust isolation practices and effective channeling, it was virtually certain that Agrisure Viptera® and Agrisure Duracade™ would disseminate throughout the U.S. corn supply and into export markets, including China, which had not approved their importation, thereby disrupting the corn market.

**333.** Syngenta also knew, but failed to disclose, suppressed and concealed, at a minimum, that (i) in 2010-2011, it would not have import approval from China by the 2011 crop year, (ii) in 2011-2012, it would not have import approval from China by the 2012 crop year, and (iii) China was a significant and growing import market. Syngenta further failed to disclose at all relevant times the insufficiency of its approval request to China, and that it sought approval to

cultivate MIR162 in China, both of which Syngenta knew would delay China's MIR 162 review and approval process. Syngenta also failed to disclose, suppressed, and concealed, that there was not (and would not be) an effective system in place for isolating or channeling of Agrisure Viptera® or Agrisure Duracade™ and the very high likelihood that MIR162 would disseminate throughout the U.S. corn supply and into export markets, including China, which had not approved their importation, thereby disrupting the corn market.

334.    Syngenta engaged in these deceptions in order to sell, and increase its sales of, Agrisure Viptera® and Agrisure Duracade™ despite Syngenta's knowledge that the more acres grown with them, the more likely it would be that they disseminate into the U.S. corn supply and corn farmers would be harmed.

335.    Syngenta knew that corn producers, such as Plaintiffs, are affected by its business and depend on it for responsible commercialization practices.

336.    For all of these reasons, Syngenta had a duty to disclose the truth – that MIR162 import approval from China, a key market, was not imminent or indeed anticipated for at least the 2011 and 2012 growing seasons, and possibly longer, there was not an effective system in place to channel Agrisure Viptera® and Agrisure Duracade™ away from China (or other foreign markets) from which Syngenta did not have approval, and the purchase and planting of Agrisure Viptera® (and later Agrisure Duracade™) created a substantial risk of losing the Chinese corn market and  prolonging the loss of the market.

337.    Syngenta also made numerous material misrepresentations, false statements, and false commentary to the effect that (i) Chinese approval of MIR 162 was on track and/or would be received during time periods when Syngenta knew it would not, and (ii) Agrisure Viptera® and Agrisure Duracade™ could, and would, be channeled away from markets for which approval

had not been obtained when Syngenta also knew it would not.  Syngenta had a duty not to mislead others and/or cause others to be misled—yet did so.

338.    Syngenta's above-described material misrepresentations, false statements, and false commentary were made intentionally and/or recklessly.

339.    Syngenta, in connection with the sale of merchandise – Agrisure Viptera® and Agrisure Duracade™--knowingly misrepresented, directly or indirectly, the true quality of Agrisure Viptera® and Agrisure Duracade™ in violation of Minn. Stat. § 325D.13.

340.    Syngenta used or employed the above-described material misrepresentations, false statements, false commentary, fraud, false pretenses, false promises, omissions, and/or deceptive acts and practices with the intent that others, including Plaintiffs, rely thereon, and on which Plaintiffs, in fact, relied, in connection with the marketing and sale of Agrisure Viptera® and Agrisure Duracade™, in violation of Minn. Stat. § 325F.69.

341.    Syngenta's violations of Minn. Stat. §§ 325D.13 and 325F.69 directly and/or proximately caused Plaintiffs to suffer (and continue to suffer) actual harm and economic injuries.

342.    This action will serve a public benefit. Not only were Syngenta's above-described material misrepresentations, false statements, and false commentary made to a large segment of the public, Syngenta's conduct vitally affected (and continues to affect) a large segment of the public as well – all farmers and others in the business of producing and selling corn and corn products – who depend on the responsible stewardship practices of developers like Syngenta when commercializing GMO products.  The issues surrounding Syngenta's duties and liabilities regarding its above-described irresponsible, intentional, and/or grossly negligent wrongful actions, inaction, misrepresentations, and omissions are not limited to corn, but impact all

developers and stakeholders in similar positions.

343.    Plaintiffs, therefore, are entitled to recover, inter alia, damages, pre- and post-judgment interest, attorneys' fees, litigation expenses, and costs.  See Minn. Stat. §8.31, subd. 3a.

## COUNT III

### NEGLIGENCE, GROSS NEGLIGENCE, AND/OR NEGLIGENCE *PER SE*
**(For Each Plaintiff under the Common Law of the State in Which Each Plaintiff's Farming Operation is Located)**

344.    The preceding factual statements and allegations are incorporated by reference.

345.    Syngenta owed its stakeholders, including Plaintiffs, a duty to use reasonable care in the timing, scope and terms under which it commercialized MIR162.

346.    Syngenta repeatedly and egregiously breached such duty by engaging in the above-described wrongful actions, inaction, misrepresentations, and omissions, and:

a.    Prematurely commercializing Agrisure Viptera® and Agrisure Duracade™ on a widespread basis without reasonable or adequate safeguards;

b.    Instituting a careless and ineffective "stewardship" program;

c.    Failing to enforce or effectively monitor its stewardship program;

d.    Selling Agrisure Viptera® and/or Agrisure Duracade™ to thousands of corn farmers with the knowledge that they lacked the mechanisms, experience, ability and/or competence to effectively isolate or "channel" such products;

e.    Failing to adequately warn and instruct corn farmers about the dangers of contamination by MIR162 and the substantial risk that planting Agrisure Viptera® and/or Agrisure Duracade™ would lead to loss of the Chinese corn market;

f.    Distributing misleading information about the importance of the Chinese corn market;

g.    Distributing misleading information regarding the timing of China's approval of Agrisure Viptera® and/or Agrisure Duracade™; and

h.    Violating the Lanham Act and MINN. STAT. §§ 325D.13 and 325F.69.

347.    Syngenta's above-described wrongful actions, inaction, misrepresentations, and

omissions directly and/or proximately caused Plaintiffs to suffer actual harm and economic damages.

348.    Syngenta's above-described wrongful actions, inaction, misrepresentations, and omissions constitute negligence, gross negligence, and negligence per se under the common law of the state in which each Plaintiff's farming operation is located.

349.    Plaintiffs, therefore, are entitled to, inter alia, an award of actual damages, consequential damages, other compensatory damages, and pre- and post-judgment interest.

350.    In light of the circumstances, Syngenta knew, or should have known, its above-described wrongful actions, inaction, misrepresentations, and omissions would cause Plaintiffs to suffer economic injury and other actual harm. Syngenta acted consciously or deliberately with oppression, fraud, malice, and wantonness in reckless disregard of Plaintiffs' rights. Syngenta also acted in conscious, intentional, and/or deliberate disregard of the high probability of harm Plaintiffs would suffer that, in fact, they have suffered and will continue to suffer. Punitive damages, therefore, are warranted.

### COUNT IV

### TORTIOUS INTERFERENCE WITH EXISTING AND/OR PROSPECTIVE BUSINESS RELATIONSHIPS
### (For Each Plaintiff under the Common Law of the State in Which Each Plaintiff's Farming Operation is Located)

351.    The preceding factual statements and allegations are incorporated by reference.

352.    Plaintiffs had business relationships with corn purchasers, prospective business relationships with corn purchasers, and the reasonable expectancy such relationships would continue and/or come to fruition.

353.    Syngenta knew about Plaintiffs' business relationships, prospective business relationships, and the reasonable expectancy such relationships would continue and/or come to

fruition.

**354.**    By its above-described wrongful actions, inaction, misrepresentations, and omissions, Syngenta interfered with, disrupted, and/or caused interference or disruption with such business relationships, prospective business relationships, and expectancies without justification or privilege.

**355.**    Syngenta's conduct was intentional, improper, and wrongful because, inter alia, the disruption and interference (i) was accomplished with misrepresentations and omissions of material facts, (ii) contaminated Plaintiffs' fields, storage units, equipment, grain elevators and other facilities in the U.S. corn supply chain, thereby constituting a trespass, and (iii) interfered with and disrupted Plaintiffs' use of their property—all in violation of Syngenta's above-described duty of care.

**356.**    Syngenta's above-described wrongful actions, inaction, misrepresentations, and omissions constitute tortious interference with existing and/or prospective business relationships under the common law of the state in which each Plaintiff's farming operation is located.

**357.**    Syngenta's tortious interference with such business relationships, prospective business relationships, and expectancies directly and/or proximately caused Plaintiffs to suffer actual harm and economic damages.

**358.**    Plaintiffs, therefore, are entitled to, inter alia, an award of actual damages, consequential damages, other compensatory damages, and pre- and post-judgment interest.

**359.**    In light of the circumstances, Syngenta knew, or should have known, its above-described wrongful actions, inaction, misrepresentations, and omissions would cause Plaintiffs to suffer economic injury and other actual harm. Syngenta acted consciously or deliberately with oppression, fraud, malice, and wantonness in reckless disregard of Plaintiffs' rights.  Syngenta

also acted in conscious, intentional, and/or deliberate disregard of the high probability of harm

Plaintiffs would suffer that, in fact, they have suffered and will continue to suffer. Punitive

damages, therefore, are warranted.

## COUNT V

## <u>TRESPASS TO CHATTELS</u>
**(For Each Plaintiff under the Common Law of the State in Which Each Plaintiff's Farming Operation is Located)**

360.    The preceding factual statements and allegations are incorporated by reference.

361.    By commercializing Agrisure Viptera® and Agrisure Duracade™ prematurely

and without adequate systems to isolate and channel it, Syngenta intentionally and repeatedly

brought Agrisure Viptera® and Agrisure Duracade™ into contact with non-Agrisure Viptera

and/or non-Agrisure Duracade corn in which Plaintiffs had and/or have possession and/or

possessory rights.

362.    Syngenta knew its above-described wrongful conduct would bring Agrisure

Viptera® and/or Duracade™ into contact with Plaintiffs' corn through the contamination of

fields, grain elevators, and other modes of storage and transport in the U.S. corn supply chain.

363.    Syngenta's above-described wrongful actions, inaction, misrepresentations, and

omissions constitute trespasses to Plaintiffs' chattels under the common law of the state in which

each Plaintiff's farming operation is located.

364.    As a direct and/or proximate result of Syngenta's repeated trespasses, Plaintiffs'

chattels (corn) were impaired as to condition, quality, or value, thereby directly and/or

proximately causing Plaintiffs to suffer actual harm and economic damages.

365.    Plaintiffs, therefore, are entitled to, inter alia, an award of actual damages,

consequential damages, other compensatory damages, and pre- and post-judgment interest.

366.    In light of the circumstances, Syngenta knew, or should have known, its above-described wrongful actions, inaction, misrepresentations, and omissions would cause Plaintiffs to suffer economic injury and other actual harm. Syngenta acted consciously or deliberately with oppression, fraud, malice, and wantonness in reckless disregard of Plaintiffs' rights.  Syngenta also acted in conscious, intentional, and/or deliberate disregard of the high probability of harm Plaintiffs would suffer that, in fact, they have suffered and will continue to suffer.  Punitive damages, therefore, are warranted.

## COUNT VI

## <u>PRIVATE NUISANCE</u>
**(For Each Plaintiff under the Common Law of the State in Which Each Plaintiff's Farming Operation is Located)**

367.    The preceding factual statements and allegations are incorporated by reference.

368.    By contaminating the U.S. corn supply (as described above), Syngenta unreasonably, materially, and substantially interfered with and obstructed Plaintiffs' free and quiet use and/or comfortable enjoyment of their land and/or property and/or property interests.

369.    Syngenta was negligent and/or grossly negligent because it knew, or should have known, that its above-described wrongful conduct involved an unreasonable risk of interfering with, or causing an invasion of, Plaintiffs' land and/or property.  Alternatively, Syngenta's above-described wrongful actions, inaction, misrepresentations, and omissions were intentional and unreasonable because Syngenta knew its conduct would unreasonably, materially, and substantially interfere with and obstruct Plaintiffs' free and quiet use and/or comfortable enjoyment of their land and/or property and/or property interests.

370.    Syngenta's above-described wrongful actions, inaction, misrepresentations, and omissions constitute a private nuisance to Plaintiffs under the common law of the state in which

each Plaintiff's farming operation is located.

371.    Syngenta's wrongful actions, inaction, misrepresentations, and omissions directly and/or proximately caused Plaintiffs to suffer actual harm and economic damages.

372.    Plaintiffs, therefore, are entitled to, inter alia, an award of actual damages, consequential damages, other compensatory damages, and pre- and post- judgment interest.

373.    In light of the circumstances, Syngenta knew, or should have known, its above-described wrongful actions, inaction, misrepresentations, and omissions would cause Plaintiffs to suffer economic injury and other actual harm. Syngenta acted consciously or deliberately with oppression, fraud, malice, wantoness in reckless disregard of Plaintiffs' rights.  Syngenta also acted in conscious, intentional, and/or deliberate disregard of the high probability of harm Plaintiffs would suffer that, in fact, they have suffered and will continue to suffer.  Punitive damages, therefore, are warranted.

## COUNT VII

## VIOLATIONS OF STATE DECEPTIVE AND UNFAIR TRADE PRACTICES ACTS AND CONSUMER PROTECTION STATUTES
### (For Each Plaintiff under the Statutes of the State in Which Each Plaintiff's Farming Operation is Located)

374.    The preceding factual statements and allegations are incorporated by reference.

375.    Syngenta's above-described knowing and willful wrongful actions, inaction, misrepresentations, and omissions—to wit, knowingly, intentionally, recklessly and/or negligently marketing, advertising and selling the Agrisure Viptera® and Agrisure Duracade™ corn seed to U.S. corn farmers prior to securing approval of the seed from the Chinese import authorities and its corresponding misrepresentations and omissions—were carried out and/or effectuated throughout the U.S., including the states in which each Plaintiff's farming operation is located.

376.    Syngenta's above-described knowing and willful wrongful actions, inaction, misrepresentations, and omissions constitute unfair methods of competition, and unlawful, unfair, fraudulent, deceptive, unconscionable, untrue and/or misleading acts and practices in the conduct of trade or commerce because (i) such conduct violated (and continues to violate) deceptive and unfair trade practices acts and consumer protection statutes of the states in which each Plaintiff's farming operation is located, (ii) such conduct violated (and continues to violate) the public policy and/or impacted the public interest of the states in which each Plaintiff's farming operation is located, (iii) such conduct has caused (and will continue to cause) Plaintiffs to suffer actual harm and economic injuries that outweigh any utility of such conduct, and such conduct (a) offends public policy, and (b) is immoral, unscrupulous, unethical, oppressive, deceitful and offensive, and (iv) Syngenta's above-described misrepresentations and omissions—on which Plaintiffs relied—were false and/or likely to deceive, and Syngenta knew so and intended for Plaintiffs to rely on them at the time Syngenta made them.

377.    Syngenta's above-described knowing and willful wrongful actions, inaction, misrepresentations, and omissions, which constitute unfair methods of competition, and unlawful, fraudulent, deceptive, unconscionable, untrue and/or misleading acts and practices in the conduct of trade or commerce, violated (and continue to violate) the following deceptive and unfair trade practices acts and consumer protection statutes of the states in which Plaintiffs' farming operations are located:

(i)    Alabama Deceptive Trade Practices Act, Ala. Code §§ 8-19-1 through 8-19-15;

(ii)    Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq*., Arkansas Products Liability Act, Ark. Code § 16-116-101, *et seq*., and/or the Arkansas strict liability statute, Ark. Code § 4-86-101, *et seq*.

(iii)    California Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200, *et seq*.;

95

(iv)    Colorado Consumer Protection Act, COL. REV. STAT. § 6-1-101, *et seq.*

(v)    Georgia Fair Business Practices Act, GA. CODE § 10-1-390, *et seq.*;

(vi)    Iowa Consumer Fraud Act, IOWA CODE § 714.16, *et seq.*;

(vii)    Idaho Consumer Protection Act, IDAHO CODE § 48-601, et seq.; and IDAHO CODE § 48-603C, *et seq.*;

(viii)    Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILL. STAT. § 505/1, *et seq.*, and/or the Illinois Uniform Deceptive Trades Practices Act, 815 ILL. STAT. § 510/1, *et seq.*;

(ix)    Indiana Deceptive Consumer Sales Act, INDIANA CODE § 24-5-0.5-1, *et seq.*;

(x)    Kansas Consumer Protection Act, KAN. STAT. § 50-623, *et seq.*;

(xi)    Kentucky Consumer Protection Act, KY. REV. STAT. § 367.110, *et seq.*;

(xii)    Michigan Consumer Protection Act, MICH. COMP. LAWS § 445.901, *et seq.*;

(xiii)    Minnesota Uniform and Deceptive Trade Practices Act (MINN. STAT. §§ 325D.43-325D.48), Minnesota Consumer Fraud Act (MINN. STAT. §§ 325F.68-325F.70), Minnesota Unfair Trade Practices Act (MINN. STAT. §§ 325D.09-325D.12), and/or Minnesota False Statement in Advertising Act (MINN. STAT. § 325F.67).

(xiv)    Missouri Merchandising Practices Act, MO. REV. STAT. § 407.010, *et seq.*;

(xv)    Nebraska Consumer Protection Act, NEB. REV. STAT. § 59-1601, *et seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, NEB. REV. STAT. § 87-301, *et seq.*;

(xvi)    New York General Business Law §§ 349 and 350;

(xvii)    Ohio Consumer Sales Practices Act, Chapter 1345 of the Ohio Revised Code;

(xviii)    Oklahoma Consumer Protection Act, OKLA. STAT. tit. 15, § 751, *et seq.*;

(xix)    South Dakota Deceptive Trade Practices and Consumer Protection Act, S.D. CODIFIED LAWS § 37-24-1, *et seq.*;

(xx)    Tennessee Consumer Protection Act, TENN. CODE ANN. § 47-18-104 and Tennessee Trade Practices Act, TENN. CODE. ANN. §§ 47-25-101, *et seq.*;

(xxi)    Texas Deceptive Trade Practices - Consumer Protection Act, TEX. BUS. & COM. CODE § 17.41, *et seq.*;

(xxii)   Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq*.;

(xxiii)  Washington Consumer Protection Act, WASH. REV. CODE § 19.86.010, *et seq*.; and

(xxiv)  Wisconsin Deceptive Trade Practices Act, WIS. STAT. § 100.18, *et seq*., and the Wisconsin Unfair Trade Practices Act, WIS. STAT. § 100.20, *et seq*.

378.     Syngenta has long been on notice of Plaintiffs' allegations, claims, and demands by the filing of thousands of actions by corn farmers throughout the U.S., the first of which was filed in 2014, and many of which have been coordinated for pre-trial purposes in MDL 2591.

379.     Plaintiffs reserve the right to allege other violations of the above-described deceptive and unfair trade practices acts and consumer protection statutes committed by Syngenta.

380.     Syngenta's above-described knowing and willful unfair methods of competition, and unlawful, unfair, fraudulent, deceptive, unconscionable, untrue and/or misleading acts and practices are ongoing. Syngenta's wrongful conduct directly and/or proximately caused Plaintiffs to suffer actual harm and economic damages—for which they are entitled to, where available, inter alia, an award of (i) actual damages, consequential damages, other compensatory damages, double damages, treble damages, other statutory damages, punitive damages, and/or pre- and post-judgment interest, (ii) equitable relief, and/or (iii) attorney's fees, litigation expenses, and costs—all as provided by each of the above-described deceptive and unfair trade practices acts and consumer protection statutes of the states in which Plaintiffs' farming operations are located.

## TOLLING OF THE STATUTES OF LIMITATION

381.     The preceding factual statements and allegations are incorporated by reference.

382.     FRAUDULENT CONCEALMENT. Syngenta took active steps to conceal its above-described wrongful actions, inaction, misrepresentations, and/or omissions. The details of Syngenta's efforts to conceal its above-described unlawful conduct are in its possession, custody,

and control, to the exclusion of Plaintiffs, and await further discovery. When this material information was first revealed to Plaintiffs, they exercised due diligence by investigating the situation, retaining counsel, and pursuing their claims. Syngenta fraudulently concealed its above-described wrongful conduct. Should such be necessary, therefore, all applicable statutes of limitation (if any) are tolled under the fraudulent concealment doctrine.

383.    **EQUITABLE ESTOPPEL**. Syngenta took active steps to conceal its above-described wrongful actions, inaction, misrepresentations, and/or omissions. The details of Syngenta's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs, and await further discovery. When this material information was first revealed to Plaintiffs, they exercised due diligence by investigating the situation, retaining counsel, and pursuing their claims. Syngenta intentionally concealed its above-described wrongful conduct. Should such be necessary, therefore, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable estoppel.

384.    **EQUITABLE TOLLING**.  Syngenta took active steps to conceal their above-described wrongful actions, inaction, misrepresentations and/or omissions. The details of Syngenta's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs, and await further discovery. When this material information was first revealed to Plaintiffs, they exercised due diligence by investigating the situation, retaining counsel, and pursuing their claims.  Syngenta intentionally concealed its above-described wrongful conduct.  Should such be necessary, therefore, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable tolling.

385.    All applicable statutes of limitation (if any) also are tolled because numerous national and state class actions alleging the same claims and causes of action against the same

Defendants based on the same facts and circumstances have been filed in (i) federal courts and state courts where *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) ("*American Pipe*") is recognized and applied, as well as (ii) state courts where *American Pipe* is not recognized and applied.

## RESPONDEAT SUPERIOR/AGENCY

386.    The preceding factual statements and allegations are incorporated by reference.

387.    Syngenta also is liable for the above-described wrongful conduct committed by its current or former officers, directors, employees, agents, and/or representatives during the course and scope of their employment by, or their respective representation of, Syngenta, under the doctrines of respondeat superior and/or agency theory; to wit, such wrongful conduct was committed (i) within Syngenta's general authority, (ii) in furtherance of Syngenta's business, and (iii) to accomplish the objective for which the officers, directors, employees, agents, and/or representatives were hired—all of which directly and/or proximately caused Plaintiffs to suffer actual harm and economic damages.

## RELIEF REQUESTED

388.    The preceding factual statements and allegations are incorporated by reference.

389.    **ACTUAL, CONSEQUENTIAL, AND/OR COMPENSATORY DAMAGES.** As a direct and/or proximate result of Syngenta's above-described wrongful actions, inaction, misrepresentations, and omissions, Plaintiffs have suffered (and will continue to suffer) actual harm and economic damages in the form of, *inter alia*, lost profits due to lower corn prices than they otherwise would have received, increased expenses, loss of reputation, and other actual injury and harm—for which they are entitled to compensation. Plaintiffs' damages were foreseeable by Syngenta and exceed the minimum jurisdictional limits of this Court. All conditions

precedent to Plaintiffs' claims for relief have been performed and/or occurred.

390.    **EXEMPLARY DAMAGES.** As detailed above, Plaintiffs also are entitled to exemplary damages as punishment and to deter such wrongful actions, inaction, misrepresentations, and omissions in the future under the common law and/or statutory law of the states in which each Plaintiff's farming operation is located. All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

391.    **TREBLE/DOUBLE DAMAGES**. As detailed above, Plaintiffs also are entitled to treble damages or double damages for Syngenta's knowing, willful, intentional, wrongful and unconscionable conduct in violation of the deceptive and unfair trade practices acts and consumer protection statutes of the states in which each Plaintiff's farming operation is located. All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

392.    **ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS**. Plaintiffs also are entitled to recover their attorneys' fees, litigation expenses and costs in prosecuting this action pursuant to, inter alia, (i) 15 U.S.C. § 1117(a)(3), (ii) the deceptive and unfair trade practices acts and consumer protection statutes of the states in which each Plaintiff's farming operation is located, and/or (iii) other statutory or common law of the states in which each Plaintiff's farming operation is located. All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

**WHEREFORE,** Plaintiffs respectfully request that Syngenta be cited to appear and answer this lawsuit and, upon final trial or hearing, judgment be awarded against Syngenta, in favor of Plaintiffs for:

(i)    actual damages, consequential damages, statutory damages, and/or other compensatory damages (as described above) in an amount to be determined by the trier of fact;

(ii)    exemplary damages;

(iii)    treble damages or double damages as set forth above;

(iv)    pre- and post-judgment interest at the highest applicable legal rates;

(v)    attorneys' fees and litigation expenses incurred through trial and any appeals;

(vi)    costs of suit; and

(vii)    such other and further relief the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs respectfully demand a trial by jury on all of their claims and causes of action so triable.

Date:  September 26, 2016

Respectfully submitted,

By: */s/ Richard L. Coffman*
Richard L. Coffman
**THE COFFMAN LAW FIRM**
First City Building
505 Orleans St., Fifth Floor
Beaumont, TX 77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
Email: rcoffman@coffmanlawfirm.com

Mitchell A. Toups
**WELLER, GREEN, TOUPS & TERRELL,  LLP**
2615 Calder Ave., Suite 400
Beaumont, TX 77702
Telephone: (409) 838-0101
Facsimile: (409) 838-6780
Email: matoups@wgttlaw.com

**COUNSEL FOR PLAINTIFFS**

**ASSOCIATED COUNSEL (pending admission *pro hac vice*)**

A. Hoyt Rowell, III
T. Christopher Tuck
James L. Ward, Jr.
Robert S. Wood
**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
1037 Chuck Dawley Blvd., Building A
Mt. Pleasant, SC  29464
Telephone: (843) 727-6500
E-mail: hrowell@rpwb.com
E-mail:  ctuck@rpwb.com
E-mail: jward@rpwb.com
E-mail: bwood@rpwb.com